## HARRISON *v.* FINK.

*(Circuit Court, N. D. Georgia. June 21, 1890.)*

1. **CARRIERS OF PASSENGERS—EJECTION OF PASSENGERS—REFUSAL TO PAY EXTRA FARE.**
   Where a passenger sought to buy a ticket, but could not, because the agent had left the office, and gone to meet the train, then standing at a water-tank some 206 feet away, and the passenger refused, willfully and captiously, to pay the conductor 25 cents in excess of the regular fare, and take a rebate check, (the requirement of the conductor being in accordance with his instructions, and having the sanction of the railroad commission of the state,) and this refusal being persisted in until the train was stopped, the conductor was authorized to put the passenger off the train.

2. **SAME—OFFER TO PAY AFTER EJECTION.**
   A passenger, who knew the duty of the conductor, and willfully and captiously refused to pay extra fare demanded of him because he had no ticket, cannot reinstate himself, after the train has been stopped to put him off, by offering to pay.

3. **SAME—ASSAULT BY CONDUCTOR—PROVOCATION.**
   A passenger cannot claim damages on account of the conductor drawing a pistol on him, and speaking of him as a coward to the other passengers, if the conductor's conduct was provoked and caused by the acts of the passenger.

At Law.

*Hall & Hammond*, for plaintiff.
*Bacon & Rutherford*, for defendant.
Before PARDEE and NEWMAN, JJ.

NEWMAN, J. This is a motion for a new trial. At the conclusion of all the testimony, both plaintiff and defendant having introducing evidence, the court directed a verdict for the defendant, for the reason that, under the most favorable view of the evidence for the plaintiff, he was not entitled to recover. The facts in the case were substantially as follows:

On the 11th day of February, 1886, the plaintiff, accompanied by his friend, Mr. Allen,—both being traveling salesmen,—came from Monticello, in a private conveyance, to Flovilla, a station on the railroad operated by the defendant as receiver at that time. They came to Flovilla to take

the train for the purpose of going to Jackson, a station on the same road, 15 miles from Flovilla. When they were out in the edge of the village of Flovilla, they heard the train on which they wished to take passage coming, between a quarter and a half mile distant. They drove up to the station, and got out of their vehicle, and went over to the railroad. The plaintiff went to the ticket-office in the depot to get a ticket to Jackson; Mr. Allen remarking to him at the time that he had a 1,000-mile ticket. The plaintiff did not find any one in the ticket-office, after looking all round, although the window of the office was open, and he was unable to get a ticket. At this time the train was standing at the water-tank, which was distant, as appears by actual measurement, from the depot, 206 feet and 4 inches. It appears from the evidence of the railroad agent there, which is uncontradicted, that he had been in the ticket-office for some time before the train came up to the water-tank, and that he left the office, and went down to the water-tank to meet the train, for the purpose of transacting his business with the train. He saw the plaintiff and his friend as he came out of the office, and started to meet the train, but did not think, from their appearance, that they wanted anything. The train drew up in a few minutes to the station, and plaintiff and his friend got aboard. When the conductor came around to take up the tickets, Mr. Allen offered him his 1,000-mile ticket, when the conductor inquired if the plaintiff was traveling for the house for which the ticket was issued, and was informed that he was not. The conductor then informed Mr. Allen that he could not take his friend's fare out of that ticket. It is not disputed that the conductor was right about this. The plaintiff then told the conductor that he was unable to get a ticket in Flovilla, and offered him 15 cents to pay his fare to Jackson. The conductor stated to him that he was not authorized to receive the 15 cents only, as he had no ticket, but he would have to require him to pay 25 cents additional, for which he would give him a rebate check. It appeared that conductors had orders to require the payment of this 25 cents extra from all passengers without tickets, and to give them a check indicating the payment of it, which would be cashed at any office of the company. The rule of the company on this subject had been approved by the railroad commission of the state, and was printed and hung up in the cars. The plaintiff knew of the existence of the rule, as he stated to the conductor that he "did not want a rebate check; that he frequently lost them, or failed to collect them." Plaintiff stated to the conductor that, as he had been unable to get a ticket, he did not think he ought to charge him more than 15 cents, the regular price. The conductor replied—according to the plaintiff, in a very gruff way—that he had nothing to do with the ticket agent; that, if he did not pay 40 cents, he would put him off the train, but, if he paid it, he would give 25 cents rebate check; and the plaintiff replied, as stated above, that he did not want a rebate check, that he frequently lost them, etc., and the conductor said, "Well, I'll put you off." The plaintiff said, "Go ahead." The conductor then walked forward to the front of the coach, pulled the bell-cord, and stopped the train, and turned around, and started towards

the plaintiff. The plaintiff, then, after the train was stopped, offered to pay the 40 cents, saying—as he said, in a joking way—that he did not feel inclined to walk back to Flovilla. The conductor, according to the plaintiff, got very angry at that, and replied that, as plaintiff had stopped the train, he could not ride on that train to Jackson for $100, and he would have to get off anyway. To this the plaintiff said: "I replied that he could not put me off, and the conductor answered he would show me about that, and went forward, out of the coach." In a few minutes the conductor returned with several men the plaintiff presumed to be trainmen, as most of them had on the uniform. Plaintiff's supposition that these trainmen were brought back with him by the conductor is contradicated by the conductor, who says that he did not bring them with him; but it seems that these men observed that the train had stopped, and the conductor go forward and return, and came, as a matter of curiosity, after him. The conductor then walked up to where the plaintiff was sitting, and requested Mr. Allen, who was on the same seat, and next to the aisle, to get up, so that he could put the plaintiff off the train. When Allen got up, the conductor walked up, and, according to the plaintiff's evidence, caught him by the coat sleeve, and said, "Come, get off." The plaintiff had a newspaper in both hands at the time, which he had been reading. With his right hand, he shoved the conductor's hand back. The conductor then grabbed the plaintiff, in a very rough way, by the collar of his coat; and plaintiff again shoved his hand back, and said that if he hurt him, he would kill him. The conductor then put his right hand back to his hip pocket, and, before the plaintiff knew what he was going to do, pulled out his pistol, and leveled it at him, close to face, exclaiming: "Let him hit me! Let him hit me!" The plaintiff was still sitting in his seat, with the newspaper in his hand, but made no motion whatever of violence towards him. Several parties then pushed him aside, one of them being one of the trainmen, in uniform, who came up, and caught hold of the plaintiff's coat collar, and said "that he would have to get off the train." The plaintiff replied: "All right. I cannot help myself, but I do not want to be hurt." He continued holding the plaintiff's coat collar, and lead him out by the collar, and put him off the train. This is substantially the plaintiff's account of the transaction. The plaintiff's friend, Mr. Allen, who was examined as a witness for him, gives an account of the transaction somewhat different in detail from the plaintiff.

His testimony as to the immediate occurrence on which the case turns is as follows:

"Mr. Harris told him that he could not accept the fifteen cents, and they had a little discussion; and he went on to explain to him about the rebate check, and told him that the rule of the company was that, when a passenger got on the train without getting a ticket, he charged him an excess fare of twenty-five cents, which would be refunded at any station. Mr. Harrison told him that he could not occupy his time running around looking up ticket agents, when he got to stations, to get it cashed; that he might lose it, and it would be a waste of time, and he was not going to pay only fifteen cents. The conductor told him that he could not accept it, and he would have to put

him off. After he had tendered the fifteen cents, and the conductor would not receive it, he told him he would have to put him off. He says: 'That's all right. That is all I am going to give you.' The conductor pulled the bell-cord, and walked to the front of the car, and came back, and told him he would have to get off. Mr. Harrison told him: 'You will have to put me off, for I am not going to give you any more.' The conductor stopped the train, and went out into the baggage-car; and, when the train slacked up, he came back,—I was sitting by him,—and he says: 'Will you please move, and let me put this man off?' I got on the opposite side of the car, and he says, 'You have got to get off,' and caught hold of Harrison; and he jerked his hand loose. *Question.* Who jerked his hand loose? *Answer.* Harrison jerked his hand loose. *Q.* Where did he catch him? *A.* About the collar or arm. He says: 'Come, my friend. You have to get off.' I think he caught him twice, and he knocked his hand loose. He says: 'Don't you hurt me. I will kill you.' In the mean time we were sitting together,—he was on the other side of the seat; and, when I got up and moved on the other side of the car, he was still sitting in the corner next to the window, with a paper in his hands. I saw there was going to be a little scuffle, and he says, 'Well, Captain, rather than to have to walk, I believe I will pay the fare,' or offered to pay it. *Q.* He offered him the money? *A.* He offered him the money. *Q.* What did he offer him? *A.* He offered him silver, I suppose; and then the conductor told him—he says: 'One hundred dollars would not pay your fare from here to Jackson. You have caused me to stop the train, and caused delay, and you have to get off.' Some one in the car caught him, and led him out to the door; and he got off the train, and went on down to Flovilla. I afterwards met him coming in a buggy. *Q.* What else did Mr. Harris do during that controversy? *A.* In reference to the pulling of a pistol on him? *Q.* Yes, sir. *A.* When Mr. Harrison told him that, if he hurt him, he would kill him, then the conductor pulled the pistol out. *Q.* Where did he get his pistol from? *A.* I don't know whether it was in his coat pocket or pistol pocket. *Q.* What did he do with it when he pulled it out? *A.* Presented it right at Harrison. *Q.* What part of his body? *A.* Up along about his face somewhere. *Q.* How far was the pistol from Mr. Harrison's face? *A.* Not more than a foot. He was next to the window, and the conductor was standing near the edge of the seat, pretty close together. A gentleman standing in the aisle caught his hand, and held it up. *Q.* What was Mr. Harris' manner at the time? *A.* Mr. Harris seemed to be determined, sir. He had stopped the train for that purpose. *Q.* Did he put him off? *A.* Yes, sir. *Q.* State what Mr. Harrison's manner was during that time. *A.* He did not seem to be excited, much,—was laughing most of the time. When he found he would have to get off, he went on towards the door with the paper in his hands. *Q.* State what his manner was throughout the entire conversation,—as to whether he was excited or not. (Defendant objected to what his manner was. Objection overruled.) *The Witness. A.* He seemed indifferent, rather, as to the paying of the fare; determined not to pay it. I did not see any boisterousness. Neither one, I think, was boisterous. Just like two determined men, —when one man is determined not to do a thing, and the other is that he shall. There was not any loud talking. It seemed that both were bent upon what they intended to do. I never heard any swearing or any oaths, or anything of the kind. I do not think there was any uttered in my hearing. *Q.* State whether Mr. Harrison made any movement, or offered to draw a pistol. *A.* I do not think he did. He had a paper in his hands, and held the paper before him. *Q.* Do you remember what he did about it? *A.* I am positive he did not draw any pistol. He made the remark: 'If you hurt me, I will kill you.' *Q.* Where were you sitting, in reference to Mr. Harrison? *A.* After I moved out of the seat, I moved to the opposite side of the aisle. During

the occurrence, I was right here, and the conductor was between me and Mr. Harrison. He was next to the window, sitting in a double seat with the seats thrown apart.  Q. State whether or not Mr. Harrison made any effort to draw a pistol.  A. He did not, sir.  Q. Did he make any motion in that direction? A. No, sir; he did not.  Q. If he had made it, would you have seen it?  A. I would have seen it, because he had a paper in both of his hands.  Q. What was he doing with the paper?  A. Reading the paper.  Q. What did he do? State his manner,—as near as you can, exactly what he did when Mr. Harris drew the pistol in his face.  A. He kind of got up, in a half-stoop position,— sort of this way,—[indicating,] and looked at the conductor, when he had the pistol on him.  It was all done so quick.  Some one was standing there, and caught his arm, and threw it up.  There were gentlemen in the aisle, and several of them jumped up, and caught his hand, and held it up.  Some one says: 'You will have to get off, and you had better get off.'  He says, 'All right,' and they led him to the front door, and he got off."

On cross-examination, among other things, Mr. Allen said that the plaintiff, in reply to the conductor's statement that he would have to put him off, said, "Go ahead, and do your best;" and also states that he supposed that he braced himself, in some way, so that he could not pull him up.  There was other testimony for the plaintiff, which does not change the character of the evidence, however, in any material respect; and there was considerable evidence for the defendant.  This evidence of the defendant's, including the testimony of the conductor himself, made a much more favorable case for the defendant than that presented above, as given from his own evidence and Allen's.  The case was considered as standing on his own evidence and Allen's, as Allen, being in the seat with him, must have known all that transpired ; and, being introduced by the plaintiff as a witness, his evidence was taken, in connection with the plaintiff's, in arriving at the most favorable view for the plaintiff of the transaction.  There was no difference, however, between their testimony on the material points on which this case turned ; nor was there, indeed, any conflict in the evidence as to the facts upon which the court directed the verdict for the defendant.  It was conceded that the plaintiff had no ticket, and it was perfectly clear that it was the duty of the conductor, under his instructions,—which instructions were legal and proper,—to require the 25 cents additional, and give him a rebate check.  It was clear that the conductor had no alternative but to comply with his instructions, and require this extra amount, and that it was the duty of the plaintiff to pay it.  It is also undisputed that the train had stopped before the plaintiff offered to pay the amount required.  Now, the train having been stopped on account of his refusal to pay what was lawfully required of him, and under his statement that he would not pay it, and that the conductor could "go ahead, and put him off," the simple question, under the authorities on the subject is, did Harrison act in good faith in his refusal to pay the amount required of him, or was his conduct, on the other hand, willful, factious, and captious?  If he had acted in good faith throughout the whole transaction, believing himself to be right in the matter, although he had caused the train to be stopped, there is authority for the position assumed by the counsel for the plaintiff that he could even

then reinstate himself by offering to pay the fare. If, on the other hand, a passenger knows the duty of a conductor, and willfully, stubbornly, and captiously refuses to do that which he knows it is the duty of the conductor to require of him, and this act causes the train to be stopped, he cannot then acquire the right to proceed by offering to pay. There are excellent reasons, found in good policy, for this rule. Trains running on railroad tracks are liable to meet other trains, and trains are following them; and, where a passenger, having the money in his possession to do so, (as it is shown this plaintiff had,) refuses to comply with a reasonable and lawful regulation, which, at the most, would cause him but the slightest inconvenience, and does so stubbornly and captiously, to gratify a mere whim, he not only inconveniences the officials of the road and the other passengers, but, by causing such a stoppage, he brings about a condition of things which, without great care on the part of the officials, may result in serious danger to human life. It would be unreasonable to hold that a passenger could thus act, and afterwards acquire any right by offering to pay his fare. If it could in any way be properly inferred from the facts, as stated by plaintiff and his witness, Mr. Allen, that he acted in good faith in the transaction, and especially in causing the train to be stopped, it would be his right to go to the jury on that question; but there is not a particle of evidence to justify any such inference. His own evidence excludes the possibility of any such conclusion being justifiably reached as to his action.

It is said that the plaintiff should have been allowed to proceed with his case, in order to recover, not only for his expulsion from the train, but also for the indignity put on the plaintiff by the manner in which he was removed,—that is, by drawing a pistol on him, and presenting it at him,—and on account of certain exclamations which the conductor says in his evidence he made to passengers in the car at the time he drew the pistol, which were: "Do not be alarmed, ladies. He is a coward." It is undisputed that the conductor first endeavored quietly and peaceably to get the plaintiff to leave the car. Harrison himself says that he laid his hand on his coat sleeve, and said, "Come, get off the train." Mr. Allen said he said: "Come, my friend. You must get off the train." The plaintiff then knocked his hand off, and, when the conductor took him by the collar, knocked his hand off again, and then, still occupying the seat and refusing to move, told him that, if he hurt him, he would kill him. Now, whether it would have been better for the conductor, under all circumstances, not to have drawn the pistol and used the language complained of in reference to the plaintiff, it is clear that all this action of the conductor was provoked and caused by the acts of the plaintiff himself. Can he, after having acted in the manner above narrated, complain of any act of the conductor's not going any further than those stated. We are not sure that any just criticism can be made of the conductor's acts or words, but it is certain that the plaintiff is in no position to claim anything on that account. Says Chief Justice BLECKLEY, in the case of *Peavy* v. *Railroad, etc., Co.*, 81 Ga. 485, 8 S. E. Rep. 70, involving a similar question:

"Did he have a cause of action for the shooting? But for his fault, the conductor would not have been brought into a state of excitement, from danger and insult, which unfitted him for discharging his proper duties, either to the company or to the passenger. Whether the conductor was more or less in fault than the plaintiff was, in shooting, certainly the plaintiff was more in fault than the company, because the plaintiff was there upon the ground, stirring up excitement, and bringing on danger both to the conductor and himself. He unfitted the conductor for exercising the care and prudence that were essential to guarding the interest of the company, and essential to performing in a proper manner his duty to the company or to the plaintiff. The plaintiff spoiled the instrument, and then sued the manager because the performer did not make good music. It was the plaintiff's fault that the conductor was out of tune; and, though the conductor might not be altogether excusable for the shooting, (according to his own evidence, however, he was excusable,) the company was not in fault for it; and it would be unjust for the plaintiff to recover of the company, when he boarded its train, violating the law, as we can well infer, by carrying upon his person a concealed weapon; violating the law again by swearing and using obscene language; violating the law again by committing an assault upon the conductor with a pistol, drawing the pistol, and presenting it at him; and violating the law by general disorder and misconduct throughout the transaction, up to the moment he was shot."

This quotation expresses very clearly, in our opinion, the correct rule on this subject. Our conclusion is, therefore, that the plaintiff is not entitled to recover, under the most favorable view of the facts of this case, for his expulsion from the train, or for the manner of his removal; and consequently the direction of a verdict for the defendant was right, and the motion for a new trial will be overruled.

PARDEE, J., concurs.