BY THE

## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS

MARCH TERM, 1907.

---

*(Continued from Volume 124)*

---

MITCHELL, Respondent, v. UNITED RAILWAYS
COMPANY, Appellant.

St. Louis Court of Appeals, May 14, 1907.

1. **PRACTICE: Consistent Theories.** A cause must be disposed of on appeal upon the same theory as that assumed at the trial by the parties.

2. **ASSAULT: Self-Defense: Insulting Epithet.** The rule in this State is that mere words however insulting will not justify an assault so as to constitute a defense to an action of trespass for assault and battery; where a passenger applied an abusive epithet to a conductor on a street car, the conductor had a right to put him off for disorderly conduct, but not to assault him.

3. ———: **Damages: Punitive Damages.** Where a passenger on a street car, in a dispute with the conductor about his fare, applied an insulting epithet to the conductor who immediately struck him, in an action for damages on account of such assault, against the street railway company, the plaintiff could not recover punitive damages.

4. ———: ———: **Excessive verdict.** And in such case where the injury was but slight, a verdict for $1,000 actual damages is shocking and shows the jury were influenced by prejudice or passion requiring a reversal of the case.

(1)

Appeal from St. Louis City Circuit Court.—*Hon. Matt. G. Reynolds,* Judge.

REVERSED AND REMANDED.

*Glendy B. Arnold* for appellant; *Boyle & Priest* and *George W. Easley* of counsel.

The demurrer to plaintiff's evidence offered at the close of his case in chief should have been sustained. Galbraith v. Fleming, 27 N. W. 581; Harrison v. Fink, 42 Fed. 787; Sonnen v. Transit Co., 102 Mo. App. 271; Eads v. Railway, 43 Mo. App. 536; Scott v. Railway, 53 Hun (N. Y.) 414; Wise v. Railroad, 91 Ky. 537, 34 S. W. 894; Railway v. Wetmore, 19 Ohio St. 110, 2 Am. Rep. 373; Peavy v. Railroad, 81 Ga. 485.

*O. J. Mudd* for respondent.

(1) The answer of the defendant is a general denial, and under such pleading the defendant had no right to ask or to receive instructions submitting a defense based upon first assault by plaintiff or justifiable provocation. O'Leary v. Rowan, 31 Mo. 117; Sloan v. Speaker, 63 Mo. App. 325; Orscheln v. Scott, 90 Mo. App. 366; (2) On the pleadings in this case the plaintiff was entitled to recover upon the mere proving of the assault. Happy v. Pritchard, 111 Mo. App. 10; Daly v. Houston, 58 Mo. 369. (3) The use of the word "lie" to the conductor under the circumstances was no justification for the assault and not even mitigation of compensatory damages. Joyce v. Jamison, 73 Mo. 28; Berryman v. Cox, 73 Mo. App. 67; Yeager v. Berry, 82 Mo. App. 534; Murray v. Boyne, 46 Mo. 472; State v. Griffin, 87 Mo. 613; 1 Kinkead on Torts, sec. 208, p. 460; Fiero on Torts, p. 435; Cooley on Torts, page 192, star p. 167. (4) The court on the evidence and pleadings in this case properly submitted the is-

sue of punitive damages. Malacek v. Railroad, 57 Mo. 17; Kennedy v. Railroad, 36 Mo. 365; Hoffman v. Gill, 102 Mo. App. 324; Sommerfield v. Railroad, 108 Mo. App. 718; McNamara v. Railroad, 182 Mo. 676. (5) The damages are not excessive. Canfield v. Railway, 59 Mo. App. 366; Miller v. Railroad, 108 Mo. App. 328; Ruth v. Railroad, 98 Mo. App. 19.

STATEMENT.—On December 16, 1904, plaintiff was a passenger on one of defendant's cars traveling north on Broadway, in the city of St. Louis. He got into an altercation with a conductor on the car, by whom he was assaulted. The action is to recover compensatory and punitive damages for the assault. The answer was a general denial.

It appears there were two conductors on the car, one a new man whom the other was "breaking in." The new man was collecting fares and the other was attending to the bell, giving signals to start and stop the car. Plaintiff did not know there was more than one conductor on the car and supposed there was but one. He took a seat near the front end of the car and when the conductor came around collecting fares, plaintiff testified he handed him a twenty-five cent piece (the fare was five cents); and the conductor undertook to hand him two dimes in change by dropping them into his hand. One of the dimes fell on the floor; the conductor looked for it, and then went to back end of the car. Plaintiff testified he looked for the dime but could not find it. In a short time the other conductor came through the car. Supposing him to be the one who collected his fare plaintiff stopped him, and testified to the following conversation: "I said: 'Look-a-here, my friend, you owe me a dime,' He says, 'Owe you a dime? For what?' Said I: 'Didn't I give you a quarter and you gave me back twenty cents?' He said, 'No, you didn't pay your fare.' Said I: 'What do you say?' He says, 'You

didn't pay your fare.' Said I: 'If you say so again, you lie.' That is what I said, plain English. And with that he hauled off and struck me a violent blow in the right eye. . . After he struck me I got up and tried to defend myself. I pushed him across the car and he pushed me back in the seat that I came from, and by that time we got pretty nigh—I should judge pretty near to Salisbury street." Plaintiff had his eye dressed at a nearby dispensary. He testified that his eye hurt him and he could not see out of it, and the evidence shows it was badly swollen and was black for two or three weeks. Plaintiff was seventy-six years old but was able, as he stated, to push the conductor down between two seats with force sufficient to break the glass out of the adjoining window. The following appears in plaintiff's cross-examination:

"Q. Now, isn't it a fact that this conductor said to you, 'I didn't collect your fare?' A. No, sir. If he had it would have settled it right there, but he never give me no chance.

"Q. Didn't he tell you that he didn't collect your fare? A. No, sir; he did not. If he had, it would have been settled right there. He never give me any chance to tell whether it was him or the other conductor. There were two conductors on the car. I never knew there were two. That is where they got it confounded right there. . . .

"Q. You don't know whether it was the new man or the old man? A. Or the old man, no, sir. I didn't know them and didn't know there were two on the car.

"Q. You didn't know there were two on the car at that time? A. If they had told me that, the thing would have been settled, there would have been no trouble.

"Q. Now, isn't it a fact that the conductor you demanded the change of told you he didn't collect the fare from you? A. There was one of them told me he didn't collect fare from me.

"Q. And when he said that didn't you tell him he was a 'God damn liar?' A. No, sir; I didn't call nobody a 'God damn liar.' I said, 'If you say that again you are a liar.' That's what I said.

"Q. Well, didn't you say, 'If you say you didn't collect my fare, you are a God damn liar?' A. No, sir.

"Q. Now, you were arguing there about that fare for quite awhile, weren't you? A. About what fare?

"Q. You and the regular conductor with the uniform on? A. Arguing about the fare?

"Q. About the change? A. You mean the dime that was lost on the floor.

"Q. Yes, I say you had quite a little argument about that before you got into the fight? A. I said, 'My friend you owe me a dime.' He says, 'For what?' I says, 'Didn't I give you a quarter and you give me back twenty cents?' He says, 'No, you didn't,' in a kind of slurring manner. He says, 'You didn't pay me no fare.' I said, 'If you say so again you lie.' That's all there is about it.

"Q. Now, that conductor was right, wasn't he? A. I don't know whether he was right or not. He wasn't right in striking me.

"Q. You didn't know whether he was right or not but still you called him a 'God damn liar?' A. I didn't say that. I never said that."

George Hank, the conductor who collected plaintiff's fare, in respect to making the change, said: "I just took the two dimes out of my changer and reached down and laid them in his hand, and one of them dropped down and I reached down and picked it up and gave it back to him, and before I could get away he dropped another one. I had several fares to collect back in the car and I went right on about my business." Witness gave the following version of the difficulty: "The conductor went out on the front end to tell the motorman to stop at Salisbury street until we could get a bucket of

fuel, and as he came back in, why the gentleman over there took hold of him somewhere by his coat and says, 'You owe me a dime;' and the conductor says, 'I didn't collect your fare. I don't owe you any dime, he says, 'You owe me a dime,' The conductor says, 'I didn't collect your fare.' He says, 'You are a God damn liar.' He says, 'You owe me a dime and I'm going to have it.' Well, the conductor, he walked on back, didn't try to interfere at all, walked on back toward the stove, and the old gentleman just kept cursing him, and the conductor started on back up toward where the old gentleman was, and he told him, 'Now, you will have to be quiet and not carry on such language in the car.' And the old gentleman got up and started to rush at the conductor, and the conductor put his hand on him to hold him in the seat, and he got up in the aisle and knocked the conductor off his feet between two seats and knocked a window light out. The conductor got to his feet then and shoved him between two seats and knocked a light out on the other side with the old gentleman. By that time the motorman stopped the car and called a policeman, and the policeman came in and put the old gentleman under arrest."

Alexander Mocobey, the conductor with whom the difficulty was had, testified as follows in regard thereto: "At Buchanan or Anglerodt I went to the motorman and told him to stop at the barns to get some fuel, and coming back through the car this man Mitchell stopped me and said he gave me a quarter and I gave him a dime, I owed him another dime, he ought to get twenty cents. I says, 'Why, man, I am not collecting any fare. How do I owe you any money?' He says, 'Yes you collected my fare.' He says, 'I want twenty cents;' that I owed him ten cents yet. And I says, 'Why, man, how can I owe it to you?' He says, 'I don't give a God damn.' He says, 'I gave you a quarter.' He says, 'You are a liar, and a God damn liar, if you say you didn't

collect my fare.' I walked away and he kept using that language, and Mr. Wintuskey told him he had to stop using such language."

Witness continued as follows:

"Q. Well, don't tell what Mr. Wintuskey said to him. Go ahead and tell what you did? A. Well, he kept using such vile language in the presence of the passengers, and I went to him and told him he had to stop using such language in the presence of passengers— women and children.

"Q. Did he stop when you went and told him? A. No, sir; he didn't.

"Q. Then what did you do? A. Then I went and told the motorman to stop and call on an officer and have him locked up.

"Q. Then what took place? A. Well, then, coming back through the car from the door, after I instructed the motorman to stop for an officer, why this man Mitchell says, 'Say, God damn you,' he says, 'I want my dime.' I says, 'I am not collecting any fares. You will have to keep quiet now.' I says, 'Stop using such language, or I'll put you off the car.'

"Q. Then what did he do? A. Then I put my hand out this way (indicating) to put my hand on his shoulder to tell him to get up and get off, and he threw his foot to kick at me and I pushed both knees down. He made the second attempt and I did the same thing. He managed to get up on his feet before I expected him to and he struck me here (indicating) and threw back in the seat, breaking a pane of glass. Well, I managed to get up on my feet in time to defend myself and struck him, I believe, here in the shoulder and knocked him back in his seat and he broke a pane of glass.

"Q. Do you know what part of his body he struck the window with? A. Why, I think by his falling back this way, his shoulder, I think his back struck the glass.

So by that time while the scuffle was going on, we run to Mallinckrodt or Salisbury, where the car stopped and the officer came on. I told the officer to lock this gentleman up for disturbing the peace, using vile language there in the car in the presence of passengers."

Mocobey's evidence was corroborated by that of a motorman of defendant who sat in a seat near plaintiff.

The court gave the following instructions for plaintiff:

"2. The court instructs the jury that if you believe and find from the testimony and all the facts·and circumstances in evidence and to your reasonable satisfaction, that on or about the sixteenth day of December, 1904, the plaintiff was a passenger on one of defendant's cars running north on Broadway in this city, and that while plaintiff was on said car as a passenger the conductor in charge of the car and while in the discharge of his duties as such conductor did strike, assault and beat the plaintiff by striking plaintiff in the face with his fist, causing plaintiff by reason of such blow to suffer physical hurt or injury, and you believe that such striking or beating was not necessary in the defense of said conductor from any assault or violence on plaintiff's part, then your verdict must be for the plaintiff.

"3. The court instructs the jury that no mere language or words used by plaintiff would justify or excuse the defendant conductor for striking or assaulting plaintiff while riding in a car of defendant as a passenger, and although you should find and believe from the testimony that before defendant's conductor struck plaintiff, if you find that he did strike plaintiff, the plaintiff had used language which you believe was offensive, and that said conductor struck plaintiff because of the use by plaintiff of such words or language, and such blow was not necessary to the defense of the conductor's person from violence or injury on the part of plaintiff, then your verdict must be for the plaintiff, notwith-

standing any such offensive words or language by plaintiff, but in determining whether or not you shall award punitive or exemplary damages, and the amount thereof should you find in favor of plaintiff, then you may consider such offensive words or language, if you find any such were used, in determining the issue of punitive or exemplary damages.

"4. The court instructs the jury that in determining whether or not the striking and assaulting of plaintiff by the conductor was necessary to the conductor's defense you may take into consideration the plaintiff's age and physical condition and that of the conductor, and the disparity, if you find there is any disparity, between the physical strength and agility of plaintiff and said conductor, and although you should find that plaintiff attempted to strike or otherwise use violence upon the person of the conductor, yet if you further find and believe from the testimony that said conductor could safely have defended and protected himself from any impending or threatened attempts or offer of violence by plaintiff without assaulting and striking plaintiff, and you further believe that said conductor had no reasonable grounds under the circumstances to believe and think that it was necessary to assault and strike plaintiff in order to defend himself against plaintiff, then such assaulting and striking was unjustifiable, and your verdict must be for the plaintiff."

For defendant, the court gave the following:

"1. The court instructs the jury that before the plaintiff can recover on the first count of his petition, the law required him to prove, by a preponderance of the evidence, that defendant's conductor, while acting within the scope and discharge of his duty as such, did wilfully and without lawful provocation, assault and beat the plaintiff, and unless he does so, your verdict must be for the defendant.

"2.   The court instructs the jury that before the plaintiff can recover on the first count of his petition, the law requires him to prove, by a preponderance of the evidence, that defendant's conductor wilfully, and without provocation, assaulted and beat the plaintiff while a passenger on defendant's car, and unless he does so, your verdict must be for the defendant.

"3.   The court instructs the jury that the mere fact that defendant's conductor was on duty and in charge of the car did not deprive him of his rights as a private citizen, and the said conductor had the lawful right, while in charge of said car, to defend his person against assaults from violence, offered by any one on the car, whether passenger or not.   And if you believe from the evidence that the plaintiff attempted to strike, fight or assault said conductor, or did strike, fight or assault said conductor on said car, without being first assailed or assaulted by the conductor, then the plaintiff cannot recover in this case, even though the conductor did strike, assault and beat the plaintiff and subject him to personal violence, provided the said conductor was acting in self-defense and used no more force than was necessary for the proper protection of his person against assault or violence by the plaintiff.

"4.   Even though you believe from the evidence in this case that the conductor did strike or assault the plaintiff first, and not in self-defense, yet, if you further believe that plaintiff commenced the altercation with the conductor by calling him violent names or applying insulting epithets to him on the car, and that the conductor struck or assaulted the plaintiff in resenting such personal abuse or insults, if any you find, then the plaintiff is not entitled to recover punitive damages on the first count of his petition."

The jury found for plaintiff and assessed his actual damages at $1,000 and punitive damages at $500.

BLAND, P. J. (after stating the facts.)—1. From the instructions asked by both parties and given by the court, it will be seen the cause was tried upon the theory that the conductor had a lawful right to defend himself, if first assaulted by plaintiff, hence plaintiff's contention, that under a general denial, the defense of *son assault* is unavailable, cannot be acceded to, for the reason the cause must be disposed of on appeal upon the same theory the parties assumed at the trial. [Meyer Bros. Drug Co. v. Bybee, 179 Mo. 354, 78 S. W. 579; McDonnell v. DeSoto Sav. & Bldg. Assn., 175 Mo. 250, 75 S. W. 438; Black v. Railway, 172 Mo. 177, 72 S. W. 559; North St. Louis B. & L. Assn. v. Obert, 169 Mo. 507, 69 S. W. 1044; Heman v. Larkin, 108 Mo. App. 392, 83 S. W. 1019; Coal Co. v. Watson, 107 Mo. App. 451, 81 S. W. 287; Strother v. DeWitt, 98 Mo. App. 293, 71 S. W. 1129.]

2. It is contended by defendant, that the injuries complained of by plaintiff were the direct and natural result of his own wrongful act and he ought not to be heard to complain; and that the rule, that mere words, however insulting and provocative of anger, will not justify an assault, does not apply in a civil suit when brought by the one assaulted against his assailant, but on the contrary, if the opprobrious epithets were such as were calculated to excite sudden passion, no recovery can be had for the assault. It is very well-settled law that if a man voluntarily enters into a fight, not in self-defense, and gets the worst of it, he cannot recover damages, unless the beating given by him by defendant was excessive or unreasonable. [Galbraith v. Fleming, 27 N. W. 581.]

In Harrison v. Fink, 42 Fed. 787, the conductor of a train rightfully and quietly endeavored to get plaintiff off the train and gently laid his hand on plaintiff's coat sleeve. Plaintiff shoved the conductor's hand back and the conductor took him by the collar. Plaintiff again

shoved his hand back and refused to leave the seat, saying to the conductor that if he hurt him he would kill him, whereupon the conductor drew and presented a pistol in plaintiff's face, at the same time saying to the passengers, "Be quiet, he is a coward." No further demonstration was made and it was held that plaintiff, after acting in the manner he did, should not be heard to complain.

Eads v. Railway, 43 Mo. App. 536, was a case where a misunderstanding arose between the conductor, and the plaintiff, a passenger, about a nickel given in change by the former to the latter. Plaintiff thought the nickel was bad. The conductor said it was good, and plaintiff said he was "a liar." Judge ELLISON, writing the opinion of the court, said:

"It is everywhere agreed that carriers must treat their passengers with respect and must endeavor to protect them from injury or insult, not only by their employees but from strangers and fellow passengers. [Spohn v. Railroad, 87 Mo. 74.]

"Public vehicles where women and children are frequently found, and where they have a right to demand security from disorderly scenes, are especially ill-adapted to exhibitions of belligerence either on the part of the carriers, servants, or the passengers. The price of a passenger's right to carriage, good treatment and protection by the carrier is not alone the money he pays, but is also his own good behavior. . . .

"The conductor had a right to express his opinion, in an inoffensive way, that he thought the nickel a good one. If, therefore, the plaintiff, without having been reasonably provoked thereto by the improper conduct of the conductor, wilfully and in anger called him a liar in the presence and hearing of the other passengers, he was guilty of disorderly conduct and the jury should have been so instructed as was asked in defendant's refused instruction, numbered 11, and plaintiff's instruc-

tion should not have submitted that matter to the jury."
It was ruled that plaintiff's disorderly conduct justified
his expulsion from the car.

It may be conceded that plaintiff's disorderly con-
duct would have justified the conductor in putting him
off the car, but he did not do this, or attempt to do it.
Instead of doing what he might have lawfully done, ac-
cording to plaintiff's evidence, the conductor struck him
a severe blow over the eye. The question for decision,
therefore, is not to find plaintiff guilty of disorderly con-
duct but to determine whether the insulting epithet ap-
plied by him to the conductor justified the assault. The
rule in criminal cases, that mere words, however in-
sulting and opprobrious, will not justify an assault, is
in this State, and most everywhere else, the rule in cases
of trespass for assault and battery. [Berryman v. Cox,
73 Mo. App. 67; Yeager v. Berry, 82 Mo. App. 534; Mur-
ray v. Boyne, 42 Mo. 472.] Kinkead says: "Nothing
seems better settled than that words, however insulting
or offensive, or threats, will not justify an assault and
battery." [1 Kinkead on Torts, sec. 208.] Fiero says:
"The mere utterance of words, however insulting and
unjustified, are not an excuse in assault, although evi-
dence thereof may be given in mitigation of damages.
So held as to a common carrier where a passenger used
indecent, insulting and provoking language to a conduc-
tor." [Fiero on Torts, p. 435.] Cooley says: "As words
never constitute an assault, neither will they justify the
employment of force in protection against them, howev-
er gross or abusive they may be." [1 Cooley on Torts (3
Ed.), p. 289.] We note these exceptions to the rule:
If the insulting words are used for the very purpose of
provoking and bringing on the assault, or if grossly vul-
gar and insulting language is employed to a female, in
the presence of her escort or members of her family, her
escort or member of her family would be justified in put-
ting a stop to it by assaulting the offender, if necessary.

For the purpose of mitigating punitive damages, all the facts and circumstances under which the assault was made are admissible in evidence. [Joice v. Branson, 73 Mo. 28; Nichols v. Winfrey, 79 Mo. 1. c. 552; Michael v. Jones, 84 Mo. 1. c. 581; Berryman v. Cox; Yeager v. Berry, supra.] The instructions given for plaintiff are in accord with the law as disclosed by the above authorities. The instructions given for defendant presented the defense in the most favorable light permissible.

3. Defendant insists that the damages are excessive and the cause is not one for punitive damages. In actions for purely personal torts, there is no scale by which the damages can be graded with any certainty. (Edwards v. Railway, 82 Mo. App. 478) and it is only where the result of the jury's deliberation shocks the understanding and impresses the conviction that the jury were influenced by passion or prejudice that courts are called upon to interfere. [Longan v. Weltmer, 180 Mo. 322, 79 S. W. 655; Rice v. Railway, 101 Mo. App. 459, 74 S. W. 428.] In cases of common assault and battery, where but one blow was struck and no severe or disabling injury was inflicted to indicate express malice, the courts take into consideration (and juries should) such extenuating circumstances as are admitted by the complaining party. Plaintiff applied to the conductor a stinging and insulting epithet, calculated to arouse his passions; an epithet which, when applied to a gentleman is usually resented by an instantaneous blow. In some jurisdictions the epithet itself justifies an ordinary battery, and in this jurisdiction has always been regarded as an extenuating circumstance. It was plaintiff's misconduct that provoked the conductor to strike him. His injury was but slight and he ought not to have large compensatory damages and no punitive damages at all. Impartial and considerate juries are not in the habit of awarding more than nominal damages in like circumstances. The award of the sum of $1,000 as damages is

Smith v. Railroad.

shocking to the understanding, and convinces us the result of the jury's deliberation shows unmistakably that they were influenced by prejudice or passion. Wherefore the judgment is reversed and the cause remanded. All concur.