J. M. HUNTER, Respondent, v. THE KANSAS CITY RAILWAYS COMPANY, Appellant.

In the Kansas City Court of Appeals, March 5, 1923.

1. **ASSAULT AND BATTERY:** Carriers: Evidence: Passenger's Provocative Conduct: Justification: Carrier Liable For Assault by Conductor upon Passenger Unless Justified on Ground of Self-defense. In an action for damages for an assault by street car conductor upon a passenger, *held* that the assault is entirely excused only when passenger's provocative conduct is such as in law amounts to a justification for the assault on the ground of self-defense, but where less than this, evidence of passenger's provocation is admissible only in mitigation of damages.

2. INSTRUCTION: An Instruction Not Warranted by Evidence and Which Assumed Disputed Fact, Held Properly Refused. In an action for damages for an assault upon passenger by street car conductor, an instruction that if conductor was in orderly discharge of his duties and passenger caused or provoked the difficulty by use of vile and opprobrious epithets which aroused conductor's passions so that he assaulted passenger in personal resentment of his conduct, then conductor alone would be liable, *held* properly refused as not supported by the evidence and as impliedly assuming that conductor was in the "orderly discharge of his duties," instead of submitting that question as one of the disputed issues.

3. ———: Damages: Punitive Damages: Mitigation: An Instruction Entirely Eliminating Question of Punitive Damages, Held Properly Refused. In an action for damages for assault by a street car conductor in striking a passenger with a switch bar, considering the means with which the assault was committed and the disparity between the age and size of the two men, which in no view, would call for the use of a dangerous weapon, the plaintiff being a man of 63, weighing only 148 pounds, and the conductor a young and vigorous man of 22, notwithstanding the fact that plaintiff may have started the trouble between them, the question of punitive damages should not have been entirely eliminated, and the refusal of an instruction to that effect was proper.

4. DAMAGES: Punitive Damages: An Award of $2500 as Punitive Damages Being Five Times Actual Damages Allowed Plaintiff For Injuries as Result of an Assault, Held Excessive by $1000. In an action for personal injuries to a passenger as result of assault by street car conductor in striking him with a switch bar where jury awarded him $500 as compensatory damages for all injuries suffered, it is *held* that an award of $2500 punitive damages in addition thereto was excessive by $1000.

5. ———: ———: An Award of Exemplary Damages is Subject to Revision by the Court and Will be Set Aside if Grossly Excessive. An award of exemplary damages is subject to revision by the court and will be set aside if it is grossly excessive or the result of improper sympathy, though interference will not be made except in extreme cases.

6. ———: Object of Punitive Damages is to Deter Commission of similar Offenses in Future, But Should be Awarded With Some Consideration of Actual Damages Sustained as Result of Injury Inflicted. The object of punitive damages is to deter the commission of similar offenses in the future, but they should be awarded with some consideration as to the actual damages sustained as result of injury inflicted.

Appeal from the Circuit Court of Jackson County.—
*Hon. Samuel E. Dew,* Judge.

AFFIRMED (*conditionally*).

*Rader & Rader* and *Scholer & Alford* for respondent.

*Charles N. Sadler* and *Louis R. Weiss* for appellant.

TRIMBLE, P. J.—Plaintiff's action is for damages
for an assault committed upon him by defendant's street
car conductor.  There was a verdict and judgment for
$500 compensatory and $2500 punitive damages.  The
defendant appealed.

After stating that the plaintiff got on the car, paid
his fare and became a passenger thereon, the petition
alleged that—"through inattention to his duties the con-
ductor failed and neglected to stop the car at the place
plaintiff desired to alight but carried him on to the next
stopping place, and, in the controversy ensuing, said
conductor vilely abused plaintiff and as plaintiff was
stepping from the car he was assaulted by said conduc-
tor and beaten over the head and hand and shoulders
with a switch bar and knocked from the car and severely
injured."

The answer was a general denial coupled with a
plea that if plaintiff was assaulted, the act of said con-
ductor was justifiable in repelling the assault of plain-
tiff, and in defending his body from the assault and
threatened violence of plaintiff.

According to plaintiff's evidence, he was either sit-
ting or standing near the rear end of the inside of the
car proper.  His stopping place was at Cleveland Avenue.
A block before that intersection was reached, the street
car crossed the Belt line tracks, and in order for it to
do so in compliance with the law, the conductor got off
the rear end, went forward to the Belt line tracks and,
seeing they were clear, signalled the car to come on across
and as it passed him he got on at the front entrance.

Plaintiff says that just after the conductor got back on at the front end, plaintiff gave the pushbutton signal to stop at the next street intersection, and then went to the rear end of the car in order to be ready to alight. There were two doors in the side of the rear vestibule, one the entrance door for incoming passengers, and the other, just in front of it, the exit door for departing passengers, the two doors being separated by a railing curving around toward the inside of the car. Plaintiff says the conductor, after getting back on at the front of the car, did not come back to the rear but stopped to chat with the motorman; that when the car reached Cleveland Avenue, it stopped in obedience to the signal he had previously given, but, as no conductor was at the rear vestibule to open the door, plaintiff walked around the railing to where the conductor usually stood, and pulled the lever thinking to open the entrance door immedaiately in front of him, but by mistake he pulled the wrong lever and opened the exit door on the other side of the railing. He at first said he pushed it to and the car went on, and then said the car went on, and, after it started, he pushed it to. He stood there while the car went on and in a moment the conductor came on back to where he was. Plaintiff says he said nothing to the conductor when he came back nor during the time the car traveled the two blocks to the next stop at Myrtle Avenue, the skip-every-other-street stop system being then in force.

When the car got to Myrtle Avenue, the plaintiff was standing in front of the entrance door and at the conductor's side. No passengers to get on were at the Myrtle stop, so the conductor did not open the entrance door but did open the exit door to let a number of passengers out and told plaintiff to go around to the exit door. Plaintiff says he walked around the railing and did not say a word as he was doing so, but when he got around to the exit door and was getting off, he said to the conductor: "If you had been tending to your business, I would have gotten off where I wanted to." Plain-

tiff says he was on the step going out and the conductor replied "Go to Hell," to which plaintiff replied "to Hell with you." Whereupon the conductor threw open the other door, grabbed the switch bar and got on the step. Plaintiff, who was then on the ground and about two feet from the car, said "Don't you hit me with that." The conductor, standing on the step and holding on to the upright rod or handhold, reached out from the car and struck plaintiff on the head with the switch bar. Plaintiff threw his dinner bucket at the conductor, but doesn't know whether it struck the conductor or not. He says the conductor dodged and drew back his bar as if to strike again, whereupon plaintiff "dodged in" and got his head against the conductor's body and encircled the latter's legs with his arms, and, in the struggle, followed the conductor up into the car, the conductor in the meantime raining blows upon his shoulder and body. Plaintiff says he was not attempting to drag the conductor from the car nor to follow him into the car, but merely to hold his own head so close against the conductor's body that the latter could not hit plaintiff on the head with the bar, or "get a good swing on me." He followed him "right upon the car and I stayed right close to him." They were then separated by the motorman and perhaps others. Plaintiff denied that he called the conductor a vile name before the latter struck him but said that he might have said "You-son-of-a-bitch or something like that" immediately after being struck and at the time he threw his dinner bucket. He did not recall using that term but once. Didn't know whether he called him a bastard or not, but didn't recall it and doesn't know what he said. He then said he was not certain that he hit the conductor when he threw the dinner bucket, he thinks he may have "hit him in the back, but it would have been a very light lick" if he did. The foregoing is the testimony given by plaintiff. In addition thereto, he placed upon the stand two young ladies (sisters) and a man by the name of Askins.

The two girls knew very little about the affair except that they saw the conductor strike plaintiff with the bar while the latter was standing on the ground and heard plaintiff *then* call the conductor the vile name above mentioned. Askins says that he was sitting on the side, or lengthwise, seat at the rear end of the car; that when the car reached Cleveland Avenue the conductor was at the front end and plaintiff was at the rear end but no one was there to open the door so he walked around the railing to the entrance door and tried to open it but couldn't and the car went on. By the time the car got to Myrtle Avenue the conductor was at his post in the rear vestibule at the entrance door. When the car stopped, the conductor opened the exit door but not the entrance door, there being no passengers to get on. Askins says plaintiff did not ask the conductor to let him out the entrance door; that plaintiff walked around to the entrance door and got off; that he, witness, was not attentive to what was said; that as the plaintiff was getting off, witness heard him say "You won't let a fellow out" and the first thing he heard the conductor say was "Don't curse me;" that he had not heard plaintiff cursing, and all the conversation he heard was as the latter was getting off; witness didn't think plaintiff had cursed, but he couldn't say he had not. However, he did hear the conductor say "Don't curse me" and that was the first he heard the conductor say; that he couldn't say what the plaintiff replied; that plaintiff got off the car and was about two feet from it when the conductor got off the car and struck plaintiff with the bar on the head once and then got back on the car; on being struck the plaintiff called the conductor the vile name and threw his dinner bucket at him and rushing up to the conductor caught him around the knees, whereupon the conductor struck plaintiff several times, and then they were separated. On cross-examination witness wouldn't swear positively whether the vile name was used before or after the conductor struck plaintiff

but didn't think it was before, and was "pretty sure" it was after plaintiff was struck.

According to the defendant's evidence, the plaintiff came to the entrance side just as the car was crossing Cleveland Avenue. The conductor asked him if he wanted off at the next stop and the plaintiff said yes. He said nothing more until the car got to Myrtle Avenue and stopped and plaintiff said "You damned son-of-a-bitch, you could have let me off at Cleveland if you had wanted to." The conductor said "Who?" and the plaintiff replied "You, you damned dirty son-of-a-bitch." The conductor says that started it all; he told the plaintiff not to curse him and, the plaintiff keeping on, the fight started; the plaintiff was on the step and the conductor struck him with his fist. While they were fighting, plaintiff on the ground and he on the step, the two were separated and the conductor got back on the car, whereupon the plaintiff threw his dinner bucket at the conductor and came back into the vestibule after him, and, thinking the plaintiff was reaching for his knife, the conductor seized a brake-shoe lying near and struck him over the head. They clinched and were separated and that ended the fight, the plaintiff was taken off the car and the conductor closed the door.

The assignments of error relate only to the refusal of defendant's refused instructions 1 and 3 and to the alleged excessiveness of the verdict.

Said instruction No. 1 sought to embody and submit the principle that if the conductor was in the orderly discharge of his duties and the plaintiff caused or brought on or provoked the difficulty by the use of vile and opprobrious epithets to him such as were reasonably likely to arouse the passions of a prudent and peaceable man and did arouse the conductor's passions so that he assaulted plaintiff in personal resentment of his conduct, then the conductor alone would be liable, but the master would not be. We say the instruction *sought* to embody the above principle, but in the language chosen

it did not do so, and, for reasons hereinafter stated, we think the refusal of the instruction as asked was proper, without regard to whether it should have been given had the instruction correctly embodied the principle relied on.   The argument underlying the contention of defendant that such an instruction is proper is this: The plaintiff, in this case, is seeking to hold, not the conductor, but the conductor's master.   If the assault was caused, brought on, or provoked by plaintiff and was such as to induce a prudent and peaceable man's passions to be aroused, and the conductor in personal resentment of such treatment was led into committing the assault on that account, ought the plaintiff to be entitled to hold the master to account for what happened? It is not a question of whether what plaintiff did would or would not justify the *conductor* were he sued, but whether plaintiff should recover damages of the master for what the plaintiff brought, or participated in bringing, on himself?   The plaintiff's conduct, in such view, is somewhat analogous to contributory negligence, the master being liable for assaults or violence of his servants only when not provoked thereto by the wrongful conduct of the passenger.   In the case of Rohrback v. Pullman's Palace Car, 166 Fed. 797, one of the cases cited by defendant in support of the view here considered, the servant was, so far as concerned the performance of his duties to the master, correct and polite and the assault occurred outside the car and wholly unconnected with any duties he owed to the master and was *purely* in resenting a personal insult offered by the plaintiff in that case.   The cases of Scott v. Central Park, etc., R. Co., 6 N. Y. Supp. 382 and Wise v. South Covington, etc., R. Co., 34 S. W. 894, seem to support the view for which defendant contends.   In Rohrback v. Pennsylvania R. Co., 244 Pa. St. 132, the assault was committed under circumstances which made it manifest from the plaintiff's own narration thereof that it was "willful act without other purposes than to inflict injury and punishment

for personal insult, and, therefore, could not have been in the discharge of any duty owing the employer." In Missouri, etc., R. Co. v. Gerren, 121 S. W. 905, 906, the court said: "Many authorities might be cited in support of the salutary rule that it is the duty of a common carrier to exercise a very high degree of care to protect its passengers from misconduct, assaults, or injury by its servants or other persons, and the extent to which our own courts have given consideration to the question of the passenger's provocative conduct when assaulted by a railway employee is to entirely excuse the assault only when the conduct of the passenger is such as in law amounts to a justification for the assault on the ground of self-defense, but, where less than this, to admit the evidence of the passenger's provocation in mitigation of damages only. [See G., H. & S. A. Ry. Co. v. La Prelle, 27 Tex. Civ. App. 496, 65 S. W. 488; St. Louis S. W. Ry. Co of Texas v. Johnson, 29 Tex. Civ. App. 184, 68 S. W. 58.]" But the court went on to say further that the facts in the case went beyond any of the cases supporting the rule announced and that where plaintiff's conduct is such as to indicate that it is "consciously and knowingly proffered with the specific purpose of bringing about a difficulty and which in its natural and probable sequence and results does bring about a difficulty, it constitutes such wrong on the passenger's part as requires the classification of such conduct as contributory negligence, notwithstanding it may not quite amount to absolute justification for the assault which follows." The last quotation is not applicable to the facts in the case at bar. We think the rule embodied in the first quotation from the Gerren case is the proper rule and the one that is observed in our State. [Mitchell v. United Rys. Co., 125 Mo. App. 1, 13.] In Eads v. Metropolitan St. Ry., 43 Mo. App. 536, 545, Judge ELLI-SON says: "The carrier is responsible for the malicious and wanton acts of the servant to a passenger whether done in the line of his employment or service or not, if

done during the course of the discharge of his duty to the
master which relates to the passenger. For he owes him,
as before stated, not only carriage, but protection also,
and if he furnishes a servant who, instead of protecting,
insults or assaults, or beats the passenger, he has di-
rectly failed of his duty to the passenger. [Goddard v.
Railroad, 57 Maine, 211-218; Craker v. Railroad, 36 Wis.
657; Philadelphia Ry. Co. v. Derby, 14 How. 468; Pen-
dleton v. Kinsey, 3 Cliff. 416; Bryant v. Rich, 106 Mass.
180; Thompson's Carriers of Passengers, 369.] We need
not say what the rule would be where a passenger be-
gins a *personal* quarrel with the carrier's servant *over
matters disconnected from the service* and thereby pro-
vokes an assault;'' and that ''If a passenger wantonly
offers a servant a personal insult and the servant resents
it on the spot in a *personal way without reference to his
duties as a servant,* it may be the passenger thus wan-
tonly bringing about the assault could not complain of
the carrier, *whatever* were the results.'' (Italics in both
instances ours.) In other words, if the difficulty grows
*purely* out of *personal* resentment engendered by the in-
sulting or abusive acts of the plaintiff and *not* out of
*anything in connection with the manner of conducting
the master's business,* then doubtless the master would
not be liable though the servant himself would be. The
instruction in the case at bar, however, does not present
the matter in any such way as this; and besides, as in-
timated hereinabove, the instruction submits and in-
cludes matters of which there is no evidence, namely,
the ''threatening to strike said conductor;'' and it also
impliedly assumes that the conductor was in the ''order-
ly discharge'' of his duties instead of submitting that as
one of the issues which was bitterly disputed. For all
of the reasons above given, the refusal of instruction 1
was proper.

Defendant's refused instruction No. 3 reads as fol-
lows:

''The court instructs the jury that even though you

believe and find from the evidence that O. L. Freeman committed an assault upon plaintiff, yet if you further believe and find from the evidence that immediately prior thereto, plaintiff called said Freeman a son-of-a-bitch (if so), and that said assault (if any), was committed by said Freeman in resenting such language, then under no circumstances can plaintiff recover exemplary damages herein, and you will render your verdict accordingly.''

The assault charged in the petition and submitted in plaintiff's instructions was an assault *with an iron bar*. There is no claim or pretense on the part of the conductor that he struck plaintiff with the iron bar because of passion but only in self-defense, and that issue was duly submitted. The fact that plaintiff used the vile epithet toward the conductor could be considered in *mitigation* of damages, but where the assault was committed with an iron bar that fact of itself would be some evidence of unnecessary force, indicative of malice, outrage or oppression, justifying the jury in inflicting some punitive damages. The instruction made no distinction whatever between an assault committed with a dangerous and deadly weapon and one committed with a comparatively harmless blow of the hand. The question in this case was whether the conductor was justified on the ground of self-defense in using this piece of iron on plaintiff's head. While the fact that plaintiff may have started the trouble could be considered in mitigation of damages, yet we do not think the question of punitive damages could be entirely withdrawn from the case, in view of the manner in which the assault was committed. The assault in Mitchell v. United R. Co., 125 Mo. App. 1, 14, where it is said no punitive damages at all should be allowed, was simply an ordinary blow of the hand and not one with a dangerous weapon. All other cases in this State, so far as we have been able to find, allow punitive damages in case there is any evidence or circumstances of malice, oppression, gross outrage, etc.,

accompanying the act. And the court in the Mitchell case, supra, p. 13, quotes Fiero on Torts as follows: "The mere utterance of words, however insulting and unjustified, are not an excuse in assault, although evidence thereof may be given in mitigation of damages. So held *as to a common carrier* where a passenger used indecent, insulting and provoking language to a conductor." (Italics ours.) Considering the means with which the assault was committed and the disparity between the age and size of the two men, which in no view could call for the use of a dangerous weapon, the plaintiff being a man of 63 weighing only 148 pounds and the conductor a young and vigorous man of 22, we do not think that even if plaintiff started the trouble, the question of punitive damages should be entirely eliminated, and hence approve the refusal of the instruction.

However, with regard to the amount of punitive damages inflicted, we cannot rid our minds of the conviction that $2500 is clearly excessive. The plaintiff was not seriously hurt. He says that after receiving the first blow he could have stepped out of the way, but he was mad, and the blows he received afterward, resulting in bruises only, were received after he entered into the fight. He says he doesn't know how hard the blow on the head was, but that it was hard enough to make it bleed. It was evidently not a hard blow for it did not knock him down or even deter him from thereupon entering into the fight. He did not obtain or require the services of a doctor, nor did he lose any time from his work. In running over the amounts awarded in assault cases, we note that unless there were aggravated circumstances of severe or permanent injury, the awards do not range much over $1000 and the great majority of them are much less. The jury found that $500 was sufficient compensation for all the injury suffered, including insult and mortification, and anything in excess of that sum is awarded not because plaintiff is entitled to it but as punishment in addition to the award of compensatory

damages. As said in Pendleton v. Norfolk, etc., R. Co., 95 S. E. 941, 944, ''exemplary damages should bear some reasonable proportion to the actual damages sustained, and what we mean by that expression is that the character of the injury inflicted should in some degree be considered by the jury, in measuring the punishment to be meted out to the defendants.'' An award of exemplary damages is subject to revision by the court and will be set aside if it is grossly excessive or the result of improper sympathy, though interference will not be made except in extreme cases. [State ex rel. v. Ellison, 268 Mo. 225, 233-235.] Of course there are many elements entering into the question of the amount of punitive damages beside the character of the injury inflicted, such as the financial ability of the parties, their standing, etc. The object of punitive damages is to deter the commission of similar offenses in the future. But taking all of these things into consideration, it seems that in this case an award of *five times* the actual damages, inflicted is clearly excessive; an award of three times the actual damages, or $1500, is amply sufficient. If, therefore, the plaintiff will, within ten days from the announcement of this opinion, remit $1000 of the punitive damages as of the date of the judgment, the same will be affirmed, otherwise it will be reversed and the cause remanded for a new trial. All concur.