FANNIE L. RANDOL v. KLINE'S, INC., a Corporation, CHARLES R. LAMPING, and WALTER J. PACKWOOD, Appellants.—49 S. W. (2d) 112.

Division Two, April 28, 1932.*

---

*NOTE: Opinion filed at October Term, 1931, April 8, 1932; motion for rehearing filed; motion overruled at April Term, April 28, 1932.

344

*McVey & Freet, Salkey & Jones* and *Russell Field* for appellants.

*Harry G. Kyle* and *Walter A. Raymond* for respondent.

WHITE, P. J.—ACTION FOR MALICIOUS PROSECUTION, in which plaintiff recovered judgment April 28, 1930, in the Circuit Court of Jackson County for $12,500 actual and $25,000 punitive damages. This is the second appeal. On the first trial the circuit court sustained a demurrer to the evidence. This court, 322 Mo. 746, 18 S. W. (2d) 500, reversed the judgment and remanded the cause. The facts in the case are set out at length in the opinion, therefore it is unnecessary to state them fully here, and we only summarize the pertinent facts.

Plaintiff testified that June 19, 1923, she went to the store of Kline's, Incorporated, in Kansas City a few minutes before the opening at nine o'clock. While waiting for the door to open she saw beaded bags in the window. She intended to buy a pair of blue shoes. She had with her a brassiere which she had bought there and was taking it back for the purpose of exchange. When the door was opened she sought the counter where the beaded bags were, and after some investigation purchased a cut steel bag of silver color, although she talked about other bags. She desired one to match a pair of blue shoes which she saw in the window. After she had purchased the cut steel bag, paid for it with a five dollar bill and received the change she was still looking at bags when another woman, Mrs. Huntsman, who proved to be a house detective, was observing them and made some conversation with her. She finally picked up a blue bag and for the purpose of matching it took it to the door where the light was better. She laid it against her dress while she was partly in and partly out of the door. The doors set in a distance of twenty feet from the outside entrance. The space between the door and the outside entrance was surrounded by show cases enclosed with glass in which goods were displayed, with an "island" in the middle. As she was matching the bag against her dress the house detective, who had conversed with her at the counter, charged her with an attempt to steal the bag.

Mrs. Huntsman testified that the plaintiff was out on the sidewalk when she stopped her, and had the bag under her cape. She conducted Mrs. Randol up to the third floor to the office manager, Mr. Lamping, where she was induced to sign a confession. How it was induced and what occurred there will be considered more fully below. An officer was called, she was taken to the police station where she put up cash for her appearance, was later tried in police court, convicted and fined ten dollars, on the evidence of Mrs. Huntsman and Mr. Lamping. She appealed the case to the circuit court where a jury acquitted her.

I. It is urged that the trial court erred in not sustaining demurrer to the evidence on the ground that the conviction in the police

court was conclusive evidence of probable cause for the prosecution. Conversely, it is claimed by the respondent that the acquittal on appeal nullified the judgment of conviction so that it was no longer even evidence of probable cause. Probable cause, an essential element in making out a case for malicious prosecution, has been defined as a belief in facts alleged in the charge, based on circumstances sufficiently reasonable to induce such belief in a person of ordinary prudence in the same situation. ■ The effect of a conviction before a justice of the peace, a finding of an indictment by a grand jury, or, in some instances, the binding over on a preliminary hearing is prima-facie evidence of probable cause. ■ A final conviction of the charge is conclusive evidence of probable cause. The prima-facie evidence of probable cause made out by conviction before a justice of the peace may be overthrown by evidence that the judgment was obtained by false or fraudulent testimony. [Wilcox v. Gilmore, 320 Mo. 280, 8 S. W. (2d) 962, 963, and cases cited.]

This point was decided against appellants on the former appeal, but the evidence possibly developed somewhat differently on the last trial and we will consider it again.

In Wilkinson v. McGee, 265 Mo. 574, 178 S. W. 471, a demurrer to the petition was sustained and the judgment affirmed because the petition while alleging there was a want of probable cause alleged that the plaintiff was indicted although the indictment was quashed on appeal, there being no allegation that the indictment was procured by fraud or false testimony.

The question arises, what is the character of the alleged false or fraudulent testimony which nullifies the prima-facie evidence of probable cause made out by a conviction before a justice of the peace or by an indictment?

When the plaintiff was taken to the office of Mr. Lamping, Mrs. Huntsman, the house detective, said to him that she "caught this woman stealing our bags." According to the plaintiff's story she denied that she was stealing the bag. Mr. Lamping reached in his desk, took out a sheet of paper, evidently a blank form used for the confession of a shoplifter, and asked the plaintiff her name. She refused to give it. Mrs. Huntsman picked up the plaintiff's purse from the table and took from it an envelope which contained a name. Mr. Lamping wrote that name in the confession. It was not the plaintiff's name; she refused to sign it, giving that as a reason. Lamping made out another paper and asked the plaintiff to sign it. She said she would not sign it. Up to that time no questions had been asked her.

She explained that she took the bag to the door to match it with a pair of blue shoes in the window and was going to ask the girl,

to make an exchange if she decided she liked the blue bag better. There was considerable conversation and the plaintiff was detained there, she said, two hours; she told Lamping that she would like to have him call Mr. Packwood, whom she knew. Mr. Packwood was the general manager. She also asked if Mrs. Hatch, who knew her, was in the building. Plaintiff was in the ice business; she protested that she had no intention to steal. They refused to call Mrs. Hatch. Packwood came in, looked at her, said he didn't know her. Then Packwood and Lamping went out of the room, leaving the plaintiff with Mrs. Huntsman, who then said to plaintiff that she ought to be big enough just to confess she was a thief and sign; if she would it would never be known outside of the store. The plaintiff protested that she could not afford to have the notoriety of signing a confession like that. Lamping came back and insisted that she sign it. She said she would not sign it. The plaintiff then asked Mr. Lamping to call Miss Gladys Raphael, whom she had seen as she entered the store and whom she knew. One Mrs. Drennan whom she knew came in at the time and expressed surprise at seeing her. Lamping said to Packwood, "Call a policeman and send her down." One of them picked up the telephone as if to call a policeman, but did not call him. Finally the plaintiff said: "Give me your pen, I will sign it. You understand it is like this, when I sign it I am not signing it because I am guilty, I am signing it because I have to get out of here. I can't stay here any longer, I have business to take care of." Then she added, "When my husband comes down here you will understand what I mean." Lamping then said, "You can't sign it under those circumstances at all." He attempted to take the pen away from her, but she signed the statement anyway, making an awkward scrawl. Lamping turned to the telephone and called a police officer. She was taken to the station. She testified that during the time she was kept in the office she cried and begged them to let her go. Mrs. Huntsman testified that when Lamping and Packwood went out of the room plaintiff said she was guilty, though witness admitted that plaintiff said when she signed the paper she didn't sign it because she was guilty but because she had to get out. Lamping testified that plaintiff first said she didn't sign it because she was guilty for she was not guilty, but he added that she finally admitted that she was guilty. On the trial in the police court plaintiff was convicted on the evidence of Lamping and Mrs. Huntsman who at the time of the trial in the circuit court had married a Mr. Arthur. The plaintiff in the circuit court swore to what was said by Lamping and Mrs. Huntsman in the police court trial.

"Mr. Lamping testified that he prepared this statement and asked me to sign it, and I first refused, and then I signed it and said that I was guilty. That, in substance, was what he said.

"Mrs. Huntsman testified that she saw me step behind two ladies and conceal the handbag underneath my coat and walk very quickly and hurriedly out of the store and across the lobby and turn south on the sidewalk, and that she accused me after I had made four or five steps south of the entrance of the lobby, not the entrance of the store, but the entrance of the lobby on the sidewalk.

"Q. What did Mrs. Huntsman testify to in regard to this purported confession?

"She said that I had first refused to sign it, finally saying, 'Well, I will admit that I am guilty, that I did steal the bag, and I will be glad to sign it.' "

Mrs. Arthur Huntsman in this case swore that she testified in the police court to about the same facts she testified to in this case. In the trial in circuit court she admitted that the plaintiff said she didn't sign the confession because she was guilty, but denied her guilt. Lamping also said that he testified to about the same things in the police court that he did on the later trial.

Mr. Lamping, relating the incident in his office said:

"After she had signed the confession she began to threaten us with a damage suit, trouble from her husband, etc., and so I left my office and went into Mr. Packwood's office which adjoined mine. . . .

"So he came in and I handed him the statement she had signed and he asked the lady if this was true and she said 'yes' and she kept threatening us and Mr. Packwood then instructed me to call Mr. Walston who was then chief of detectives, and tell him about the case, that we had a lady in the office who had taken a bag out of the store and admitted her guilt and signed a confession and he asked me to hold her there and he would send for her."

On cross-examination he said:

"I did not turn her loose when she signed the confession because of her threatening attitude, which caused me to talk to Mr. Packwood about it."

Later in the day the plaintiff returned to the store with her husband. They went to Lamping's office where a one-sided fight occurred, resulting in favor of Mr. Randol, against Lamping, Packwood and another employee of the store. (Plaintiff's version of it is related in the former opinion, 322 Mo. 746, 18 S. W. (2d) l. c. 504. Defendants' evidence here makes it an inocuous incident.)

Defendant employed prominent attorneys to prosecute the case in the circuit court. Walston testified that Detective Green brought

the woman to him. After talking with her he called Mr. Lamping and said: "This woman has told her story and I believe it." Lamping replied: "Well, we will prosecute her to the limit." Lamping denied this.

Policeman Green was called as a witness for the plaintiff. He said that he arrested the plaintiff and took her to the station. His narrative was entirely colorless. On cross-examination the defendant produced a sworn statement in which the witness said that Walston never in his presence expressed doubt of the defendant's guilt. That she told Walston she had signed a confession because she thought that Kline's would release her and her friends and other people would know nothing about what had occurred.

On redirect examination Mr. Green testified that the statement which he had signed was prepared by defendant's atorney; that he did not read it; that when he was asked to sign it the attorney told him it would be worth $500 to him (the attorney), and that witness signed it expecting to get the $500.

■ Appellant cites Firer v. Lowery, 59 Mo. App. 92. In that case there was evidence indicating the good faith of the party causing the prosecution because he depended for his facts upon information furnished by the witnesses. In this case it was the defendants themselves and the defendant corporation's own agents who furnished the testimony on which the conviction was procured. They knew whether it was true or not. According to the plaintiff's evidence they said nothing in the police court about the plaintiff's protest that she was innocent at the time she signed the confession; they prosecuted the conviction on the bald statement that she admitted without qualification that she was guilty. If they gave such testimony without giving her qualifying protestation of innocence, then their testimony before the police judge was false and fraudulent. If the jury in circuit court believed the plaintiff, the defendants' contradictory evidence would not impair its effect; it was for the jury to say whether their testimony in the police court, put in that way was the cause of Mrs. Randol's conviction.

■ Other facts tend to show malice in the prosecution. Mr. Lamping said that he decided to call the policeman because the plaintiff threatened a damage suit. The defendants employed prominent attorneys to prosecute the case in the circuit court, and then manipulated or attempted to manipulate an affidavit by Policeman Green so as to nullify any testimony he might give for the plaintiff. Notwithstanding the telephone message of Walston, Chief of Police, that he believed Mrs. Randol's story, Mr. Lamping declared he would prosecute her to the limit. All this was evidence from which the jury could infer a lack of good faith in the prosecution and the procurement of the conviction in the police court by false and

fraudulent testimony. It was not necessary to show conclusively that the evidence was false and undisputed to be so. It was sufficient if the proof satisfied the jury that it was false or fraudulent and the conviction was thereby procured. So the demurrer to the evidence was properly overruled.

II. Error is assigned to the admission of evidence offered by plaintiff to prove damage to her reputation by specific instances.

The plaintiff introduced witnesses to show that she was a member of the Christian Church, in good standing; that before the charge of shoplifting was filed against her she had many visitors to her home; she did a good deal of entertaining, gave dinner parties, was often invited socially, was on friendly terms with all her neighbors, would run in and out of their houses in a friendly way; that after her arrest for shoplifting her friends ceased to visit her, people treated her with coolness, and even some who had said they believed her innocent refrained from visiting her as before. In the past six years, since her conviction, she stated that she had eaten one dinner by invitation in a home. Before that she had been invited into the homes.

On this point the appellants rely upon the general rule that a general reputation must be proved in a general way and not by specific instances, citing Yager v. Bruce, 116 Mo. App. 1. c. 493, 494, where the St. Louis Court of Appeals, in a slander suit said error was committed in permitting a witness to state his personal dealings with the plaintiff in which the plaintiff had been honest. It seems to us that such evidence is not always incompetent in a case of this kind.

The plaintiff in such case is entitled to special damages such as are pleaded in this case: the loss of friends and social position may be considered as special damages. [Newall on Malicious Prosecution, pages 494, 500, 501, 502.] Besides, the evidence went in without the objection assigned here. At the pages mentioned in the abstract of the record by the plaintiff the first objection was:

"I object to that if the court please because there is no evidence as to that—this is the first inkling of anything of the kind."

That objection occurred after the plaintiff had testified to the change in friends who formerly visited her, telephoned her, but had ceased to do so. No further objection was raised at that point. The other objection was this:

"I object to that if the court please as calling for a conclusion of the witness; also as a reputation, particularly because it calls for a conclusion and an improper conclusion of the witness."

Other objections equally as far from the point as those occur in the record. The trial court was not apprised by those objections

that this evidence was claimed to be incompetent on the ground that loss of reputation was proved by specific instances. The defendant is not in position to complain here of the admission of that evidence.

 III. Complaint is made of several instructions given for plaintiff, among them P-1, an instruction of great length covering the whole case requiring a finding by the jury of all the essential facts shown by the evidence. The objection is that it did not authorize a verdict against one or more of the defendants and in favor of the remainder. The court, however, furnished to the jury four forms of verdict: a form for a finding against all the defendants by all the jury; a form for finding against one or more of the defendants by unanimous verdict; a form for finding against all the defendants by a majority verdict; and a form for finding against one or more of the defendants by a majority verdict. So the jury could hardly understand that they were not at liberty to find against one or more of the defendants and in favor of the other or others. In a colloquy in the course of the argument plaintiff's counsel said that the jury were at liberty to find against one or more of the defendants and in favor of the others. Instruction P-1 required the jury, before they could find for the plaintiff, to find that the defendants falsely and fraudulently testified that plaintiff voluntarily signed a confession, etc., and that the "defendants" (plural all the way through), committed all the acts complained of, such as beginning and conducting the prosecution without probable cause. The defendants joined issue on that Instruction D-2, which the court gave at their instance, as follows:

"You are further instructed that such finding of guilt by said municipal court is prima-facie evidence of probable cause for the prosecution of Fannie L. Randol and is conclusive unless you further find and believe from the greater weight of the credible evidence that such finding was the result of false and perjured testimony given by the *defendants, their* agents and employees before said Municipal Judge."

 Under that instruction the jury could not find against any one of the defendants unless they found that all of them had furnished false and perjured testimony to secure the conviction in the municipal court. If error, that was favorable to defendants.

While Instruction P-1 classed the defendants together in the acts complained of, Instruction D-2 classed them likewise and required a finding which was to the disadvantage of the plaintiff. The plaintiff could not recover *at all* against any one of the defendants unless they found that *all* the defendants were guilty of furnishing false

and fraudulent testimony on which plaintiff was convicted. Having submitted the case on that theory appellants cannot now be heard to complain.

Evidently the defendants thought the advantage accruing to them by that requirement would more than counterbalance the disadvantage in the lack of a direct instruction that they might find for or against each defendant separately. They are bound on appeal by the theory adopted at the trial.

Objection is also made to Instruction P-6 on the credibility of witnesses which contains this paragraph:

"Indetermining as to the credit you will give to a witness and the weight and value you will attach to a witness' testimony, you should take into consideration the conduct and appearance of the witness upon the stand, the interest of the witness, if any, in the result of the trial, the motives actuating the witness in testifying, the witness' relation to or feeling for or against the defendants or alleged injured party, the probability or improbability of the witness' statements, the opportunity the witness had to observe and be informed as to matters respecting which the witness gives testimony, *the inclination of the witness to speak truthfully or otherwise, regarding the matters within the knowledge of such witness.*"

The objection is to the words in italics, that they permitted the jury to delve into matters purely speculative, to consider matters not in issue, and that there is no evidence to justify the instruction. An instruction almost like it was approved by this court in Wendling v. Bowden, 252 Mo. l. c. 693, 161 S. W. 774. Appellant attempts to distinguish in that case because the instruction there authorized the jury to consider the *character* of the witnesses and from that consideration they might determine whether the witnesses were inclined to speak truthfully or otherwise. The instruction here, P-6, authorized the jury to take into consideration the "conduct and appearance" of the witness upon the stand, the interest of the witness, if any, etc.

The jury in considering the "inclination of the witness to speak truthfully or otherwise" is merely estimating the veracity of the witness, which the jury must always judge. The instruction limits that judgment to matters "within the knowledge of the witness." The jury could estimate something of the veracity of the witnesses from what was said by other witnesses in the case. From his conduct and appearance upon the stand and from what the jury could know of matters within his knowledge, they would be able to judge his "inclination to speak truthfully or otherwise." There is no reason for saying that the instruction allows a pure speculation on the part of the jury. They must judge by appearances and the

knowledge of the witnesses of the matters about which they testify. We cannot say that the instruction was likely to mislead the jury.

IV. Complaint is made of the argument of plaintiff's counsel who began by saying that a charge of vagrancy was lodged against the plaintiff:

"Vagrancy, what does that mean? . . ."

At that point the defendants objected, the court overruled the objection, and nothing more was said about vagrancy.

The defendants in their answer quote Section '968 of the Revised Ordinances of Kansas City, under which the plaintiff was prosecuted. It declared that one guilty of carrying away any article of personal property from any place of business would be guilty of vagrancy. In the petition of the plaintiff is the alleged form of complaint of one charged with vagrancy. It sets out that she was a frequenter of saloons, bawdy houses, and other disorderly places; that she was a prostitute, an inmate of bawdy houses. The opinion in the former case, 322 Mo. 746, 18 S. W. (2d) 500, stated that those charges were lodged against her. It appears that all those charges were in a printed form of complaint where one is charged with vagrancy. Upon trial of this case the full charge, on objection of the defendants, was not read to the jury. The court permitted read only that part charging the shoplifting. The record does not disclose whether in the police court the whole charge was read or not. Whatever it was was on file there. It does not appear in the record here. At any rate the charge of shoplifting was in the complaint and it is defined as a form of vagrancy. Counsel for plaintiffs was entirely within his rights in mentioning that she was charged with vagrancy. Plaintiff then continued his argument, as follows:

"Mr. Kyle: If your Honor please, and gentlemen of the jury: Mr. Field has suggested that I might cry a little. Let me say that it is not necessary for me to cry and shed any tears, because Mrs. Randol has been shedding tears for seven years over this matter. For seven years she has shed the tears, and my shedding more tears would not do any good now.

"Mr. Field sheds the tears for Kline's. He brings in Mr. Packwood and puts him on the stand, brings him in from the farm in Kansas, runs him through the shops and the streets, and gives him a home, and puts a mortgage on the home. A Kline move. A Kline thought. I want to say now that Mr. Packwood and Mr. Lamping are only instruments in this matter. They are like the light wires from a dynamo. Don't you worry any about the mortgaged home, or the equity in the home. A judgment that you render in this

358

case against Packwood, against Lamping, will have to be paid by Kline.

"MR. FREET: I object to that and move that the jury be discharged. It is highly improper, and directly contrary to the instructions of the court.

"THE COURT: Motion to discharge overruled. Confine yourself to the facts in this case.

"To which action, order and ruling of the court the defendants, and each of them, then and there at the time duly excepted and still except.

"MR. KYLE (continuing):—for the reason that it is shown in this case that they are the agents and instruments of Kline's."

██ It will be noted that the objection to this argument was that it was wholly improper without stating why it was improper. It was improper, but the plaintiff's counsel went on to explain that it is shown in the case that Packwood and Lamping were the agents and instruments of Kline's, and further on in his argument he said that while they were all joint defendants Kline's responsibility was only because his agents were responsible. It was counsel's interpretation of the relation of the parties to each other, that the agents who were alleged to have furnished the false testimony would not have to pay the judgment because they were the agents of Kline's in so doing. It is not objected that that was not a correct conclusion from the relation of the parties. While the argument was improper, even if properly objected to it did not authorize the drastic remedy demanded by defendants, that the jury be discharged. The court took notice of it and directed the plaintiff's counsel to confine himself to the facts in the case. He was not to draw conclusions of that sort; a very mild reprimand but no additional reprimand was requested, no instruction requesting the jury to disregard it. No ruling was asked, except that the jury be discharged. Under the circumstances the court was justified in refusing that request.

Plaintiff's counsel then went on at some length with his agrument which is set out in the record with no objection whatever made until he said:

"They are all joint defendants, Kline's are responsible only because their agents are responsible, and each agent is jointly responsible:"

Defendants' counsel then objected that under the instruction of the court the jury might return a verdict against one or more of the defendants. Plaintiff's counsel replied:

"That is true, I will explain that to the jury."

Defendants objected to the counsel's statement, giving no reason. The court then said there was no instruction to the jury as to what they might do as to all or any of the defendants; that there were simply some forms of verdict in the instructions. The defendants thereupon excepted. We are unable to grasp to what the exception was made. No ruling was asked by the court. Since the court was not asked to rule upon it in any way, and since appellants fail to point out in what particular they were prejudiced by it, we cannot find reversible error.

Plaintiff's counsel continued his argument and there was a further objection but no exception was saved. We find, therefore, no ground for reversal in anything connected with the plaintiff's argument.

V. It is claimed that the verdict is so excessive as to indicate passion and prejudice justifying a reversal of the judgment. Appellants cite a number of cases. They say that in none of the cases in Missouri in which judgment for malicious prosecution was rendered, was a verdict so large as that rendered in this case sustained by this court. In some of them where the verdict was much less than the verdict rendered here the plaintiffs suffered considerably more than the plaintiff did here. They were imprisoned in disagreeable and uncomfortable quarters and subjected to physical hardships which were not present in this case. Respondent on the other hand points to some very large verdicts for libel and slander much larger than the one here.

The law does not look with favor upon actions for malicious prosecution. To encourage actions of that kind would render people afraid to render assistance to the State in the prosecution of crime. While that is true, the disgrace and impairment of reputation and the like is just as serious to the party who suffers it as is disgrace from defamation. This case has been before three juries. The first jury was not permitted to pass upon the facts, a demurrer to the evidence was sustained; and the second jury, it is stated by respondent, rendered a verdict for $20,000 actual and $5000 punitive damages. The third, $12,500 actual and $25,000 punitive damages. To reverse and remand this case for another trial with all its expense and harassment would not be likely to result appreciably different from the two verdicts previously rendered.

The plaintiff offered evidence to show humiliation, serious impairment of her reputation, incidental injury to her business. She testified to insulting language used to her in the office of the defendants. All of this goes to the actual damages and not to punitive damages, and we allow the verdict for actual damages to stand as found.

There are facts showing malice which justify punitive damages. When the chief of police called Mr. Lamping over the telephone and said he believed the plaintiff's story, Lamping replied that he would prosecute to the limit. From Lamping's own statement it may be inferred that the prosecution was begun and carried on to forestall a damage suit. The defendants employed very able attorneys to prosecute it, instead of leaving it to the State. The manner of defendants in procuring the statements of J. L. Green, detective, shows an attempt to collect all possible testimony injurious to Mrs. Randol in the shoplifting case.

The purpose of punitive damages is to inflict a penalty so as to deter a repetition to the malicious acts. The size of the punitive damages cannot be measured by the humiliation and circumstances which tended to degrade the plaintiff. All those matters of aggravation must be included in her actual damages. The punitive damages assessed here are so enormous that the jury must have misjudged the penalty necessary as a deterrent to future actions of the kind. We think that five thousand dollars is entirely sufficient to assess as punitive damages. If, therefore, the plaintiff will remit $20,000 from her judgment within ten days it will be affirmed. Otherwise the judgment will be reversed and the cause remanded. *Henwood, J.*, concurs; *Ellison, J.*, absent.