W. G. POLK v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a Corporation, Appellant.—No. 37923.—174 S. W. (2d) 176.

Division Two, August 27, 1943.

Motions to Modify Opinion and for Rehearing Overruled, October 4, 1943.

866

*Carl S. Hoffman, John T. Martin* and *Montgomery, Martin, Salveter & Montgomery* for appellant.

*Clarence C. Chilcott, Payne H. Ratner, Crouch & Crouch* and *Will H. Hargus* for respondent.

868

BARRETT, C.—In this the third trial of W. G. Polk's action against the Missouri-Kansas-Texas Railroad Company for malicious prosecution the jury returned a verdict for $9,000.00 actual damages and $18,000.00 punitive damages. On this appeal the railroad urges two points: (1) that under the last opinion in this case (Polk v. M. K. & T. Ry. Co., 346 Mo. 793, 142 S. W. (2d) 1061) the court erred in permitting certain of the plaintiff's witnesses to testify that they had obtained and then been denied permission to carry out tests with reference to visibility in the defendant's yards in October, 1933; and (2) that the award of $18,000.00 as punitive damages is excessive.

The railroad's first objection is fully appreciated in view of the circumstances out of which the action arose. Substantially, the basic facts are as they were on the first appeal, Polk v. M. K. & T. Ry. Co., 341 Mo. 1213, 111 S. W. (2d) 138. The railroad maintains extensive

yards in Parsons, Kansas. The yards in question are divided into three parts, the east yards, the Klondike yards and west yards. The east yards were the busiest and most frequently used, while the west yards were used for the storage of cars and the making up of local trains, especially the Cherokee and Joplin locals. Prior to August, 1933, a "drop or pedder car" of mixed merchandise on the Cherokee local had been broken into and goods removed four times and from the circumstances it was thought the burglaries had occurred while the cars were in the yards.

On August 13, 1933 W. G. Polk went to work in the yards about 11:30 as "the long field man" with a switching crew. The greater part of the crew's work had been in the east yards, but after certain other movements in the east yards it was understood that the next movements would be in the west yards and because of that fact Polk says he went into the west yards for [177] the purpose of informing himself as to the condition of the tracks and the location of the cars, especially of the cars to be used in the next movements. While he was in the west yards, shortly after 2 o'clock of the morning of the 14th, he was taken into custody by the Baxley brothers, members of the railroad's special service department, placed in the Parsons city jail and charged with burglarizing the merchandise car.

In the west yards Polk determined whether the cars they had previously "kicked in" on track 2 had cleared the lead and whether there was room next the cabooses for making up the locals. As he walked north between tracks 2 and 3 he looked between the cars on tracks 3 and 4 and saw a caboose on track 5 and in order to identify it as a caboose belonging to one of the locals (trains are made up against cabooses) and to determine whether there was room between it and the lead for the balance of the local he climbed over the couplings of cars on tracks 3 and 4. As he did so his electric lantern went out and when he got to the caboose on track 5 he struck a match and ascertained that it belonged to the Cherokee local. He climbed back over a tank car and started south between tracks 3 and 4. When he had gone a short distance three men, the Baxley brothers, flashed their lights on him and with pistols and a shotgun ordered him to put his hands up. The Baxley brothers had been sitting under a tank car about two car lengths from the merchandise car watching for anyone who might enter the car. They had previously checked the seals on the car. They said they first heard someone walking and later could see a man walking with a light on the opposite side of the cars. Soon the man climbed between the cars, went north, then came back south, broke the seal on the merchandise car, opened the door, entered, flashed a light and in a minute or a minute and a half came out of the car, closed the door and moved south. The man had proceeded but a short distance when they stopped him and accused him of having broken into the car, which he immediately denied. The man they

arrested was Polk. They searched him and examined the car and nothing was missing. Later with two policemen they searched his home and nothing was found. They found the car seal about two hours after arresting Polk and they said it was near the point they had stopped him.

William Baxley signed a complaint charging Polk with the felony of burglary in the second degree. He was given a preliminary hearing on August 24, 1933, and bound over to the district court. The county attorney refused to file an information and in accordance with a statutory requirement filed a written statement of his reasons for not doing so. His statement briefly summarized the history of the case up to that time and concluded by saying that "more evidence is required in a case of this kind."

On Polk's preliminary hearing and in the second trial as well as in the third trial the Baxleys testified that they saw Polk open the door to and enter the car and come out. And as was said on the first appeal, 341 Mo. l. c. 1219: "If true, it showed probable cause for the arrest and prosecution. . . . Plaintiff, at the trial of this case, testified that said testimony of the Baxleys was false—a dispute resolved in the plaintiff's favor by the verdict of the jury." Polk has contended throughout this controversy that he could demonstrate that the Baxleys' testimony that they saw him enter and leave the car was false because it was not possible for them to see him or anyone else at the door of the merchandise car from their position beneath the tank car under the condition as they were at 2 o'clock on the morning of August 13, 1933. On the last appeal the court puts the matter thus, 346 Mo. l. c. 797: "The litigants agree that an important factual issue involved in the prosecution of the charge against plaintiff was the ability of defendant's special agents to have seen the movements of plaintiff on the night of August 13, 1933." Not only was it an important factual issue involved in the criminal charge but it was made one of the most important factual issues in the last trial.

It should be borne in mind that Polk's preliminary was held on August 24, 1933. He was bound over to the next term of the district court, which was the November term, and in the normal course of events his criminal case would have been tried during the first or second week in November.

During the second trial "Six witnesses testified that they went to defendant's switchyard in Parsons between 1:30 and 2:00 A. M. to make experiments with respect to the ability of one to observe the movements of plaintiff as testified to by defendant's special agents, and that they were ordered from the premises and prevented from making the desired observations. This occurred about the middle of October, 1933, prior to plaintiff receiving information that the charges pending against him would be dismissed. . . . . Mr. Ratner testified that he applied to someone; that they 'told me it

would be all right;' that 'I supposed it would be all right.' Witness could not conceive of any possible objection on defendant's part.'' (346 Mo. l. c. 797, 798.)

On the second appeal the court stated that the railroad did not question the admissibility of such experiments or the right of the plaintiff to make them but as to the showing made the court said, 346 Mo. l. c. 798, 799, 800: *"Plaintiff's right to enter upon defendant's premises rests wholly upon private arrangements made by his counsel Ratner. . . . He gave no factual testimony from which a jury could determine whether he, in fact, had been authorized to enter upon defendant's premises, or if the party who told him it would be all right was authorized to grant permission. It is evident from his testimony he desired to make the observations when the moon would be at a position corresponding to that on the night plaintiff was arrested, but he gave no testimony that a particular night had been agreed upon between him and the party to whom he referred.* (Italics supplied.) . . . *Plaintiff's evidence does not remove from speculation and conjecture any wrongful action on the part of defendant in the occurrence,* and defendant's evidence discloses a willingness on the part of the defendant to reasonably cooperate with plaintiff in granting access to its switchyards for experiments therein. That the plaintiff has a suit pending against defendant does not give plaintiff carte blanche authority to make experiments upon defendant's premises. To hold a plaintiff has such right willy-nilly would unreasonably place defendants at the mercy of plaintiffs on the issue of malice vel non in many actions of this nature. . . . *There is no evidence of probative value that Mr. Ratner's unescorted party of seven was authorized to enter upon defendant's premises . . . In the circumstances, the admission of this evidence,* repeated in substance by six witnesses and receiving the repeated sanction of the court through the overruling of defendant's objections, *gave plaintiff an unfair and prejudicial advantage and was reversible error."* For these reasons the railroad was given a new trial.

Governor Ratner testified by deposition on the second trial. On both direct and cross-examination, on the second trial, Governor Ratner stated that he could not say positively who gave him permission to enter the yards because he did not have his file before him. On the third trial his deposition was again taken and used and he stated that he had refreshed his memory from a notation on his file and that about the middle of October, the 10th, 11th or 12th, the day before he and his party went to the yards for the purpose of making observations he called Mr. Little, the district superintendent of the railroad on the 'phone and gave him full information as to what he desired and that Mr. Little gave him permission to go into the yards and make certain observations and experiments. ''The notation on the file in substance is that on a certain date I conferred with Mr.

Little for permission to make the Polk investigation in the Katy switchyards at night, the night when the moon was in the same condition, and Mr. Little granted his permission.'' Governor Ratner was representing Polk in his criminal case and his request was made before that case was disposed of. He explained to Mr. Little that he wanted to take some people into the yards at ''approximately the same time of night and when the moon was in the same condition as when Polk was arrested . . . because the Baxley brothers had testified (at the preliminary) that they had been able to see a certain distance in those yards a certain time of night with the moon in a certain position in the sky and I wanted to find out whether they could see as far as they had testified they could under these conditions.'' He had gotten the exact condition of the moon from an almanac and the night they went to the yards the condition was the same as it had been on the night of Polk's arrest and would not be the same again before the criminal case was to be tried in November. He says he was specific as to time, place and what he intended to do and that Mr. Little positively agreed to it without [179] any reservations whatever and nothing was said as to a guard for safe conduct through the yards. When Governor Ratner and his party (including his son, twelve years of age) appeared at the yards they were met by William Baxley and ordered out of the yards, although they told him Mr. Little had given them permission to make their observations that night. The five people who accompanied Governor Ratner, except his son, all testified to their being met by William Baxley and ordered out of the yards.

It does not appear from the reported case of the second trial what the railroad's evidence and position was but on the trial of this case Mr. Little conceded that Governor Ratner had called him on the afternoon of October 11, 1933, and said that he wanted to take a party into the yards in the interests of his client, Polk. Mr. Little's version of the 'phone call was that he told Governor Ratner he was sure it could be arranged and he would take the matter up with his counsel. The next day he took the matter up with counsel and then instructed the day yardmaster to see to it that Governor Ratner and his party were safely conducted through the yards. Mr. Little then says that at exactly 8 o'clock on the evening of the 12th a lady called and said that she was talking for Governor Ratner and that he wanted to go through the yards about 2 o'clock that night and Mr. Little says he instructed her to tell him to not go that night because he had made arrangements for them to go in the *daytime*. Mr. Little, in testifying to these facts, refreshed his memory from notes on his file.

The inference from his testimony was that the lady calling was one of Governor Ratner's secretaries and in rebuttal the two women who had been in his office in October, 1933, denied calling Mr. Little and denied having any such conversation with him.

Polk's theory was, as we have said, that the night of August 14, 1933, at 2:00 A. M., was so dark that the Baxley brothers could not possibly have seen him or anyone else enter and leave the merchandise car in question and that, therefore, their testimony given at his preliminary hearing and upon which his prosecution was based was false and untrue. There were floodlights at the north end of the east yards and the railroad's position was that these lights illuminated the west yards. In addition the railroad performed experiments and produced witnesses who testified that even without the floodlights a man could be seen entering and leaving the merchandise car as the Baxley brothers testified and have contended throughout this litigation.

■ Relying solely on the opinion in the second appeal the railroad says it was again error for the court to permit Polk, Governor Ratner and their party to testify "that they had been refused permission to carry out tests to determine the condition affecting visibility at the point of plaintiff's arrest when they had visited the yards on an occasion in October of 1933, at about 2 o'clock in the morning." The railroad's interpretation of our former opinion is this: "What this court held on the former appeal was that, considering all the circumstances which the evidence disclosed in relation to this matter, the showing made by plaintiff did not remove from the field of speculation and conjecture the inference of wrongful action on the part of the defendant. *It is submitted that the additional evidence presented by the plaintiff on this last trial does not change the situation in this regard.*" The railroad, to substantiate its argument, says it was under no legal obligation to open its premises; that there is no evidence justifying an inference that it was unwilling for the tests to be made and, finally, that its refusal on the occasion in question does not afford any basis for an inference that it was actuated by wrongful motives or was guilty of wrongdoing.

The first opinion did not hold that the questioned testimony was inadmissible in any event but, as the railroad says, it held, considering all the circumstances, that the plaintiff had failed to sustain his burden, as he claimed, that someone in authority had given him and his party permission to enter the yards and make experiments and observations. The opinion holds that the plaintiff's showing of a "private arrangement" to enter the railroad's yards was too indefinite and uncertain to permit an inference of wrongdoing when the railroad refused to permit the experiments on the night the plaintiff and his party appeared at the yards. On the trial of this case the deficiencies mentioned in the second opinion have been supplied if the jury chose to believe the plaintiff's witnesses rather than the defendant's witnesses. The plaintiff and his counsel have claimed throughout this controversy that they desired to make the observations and experiments preparatory to defending the burglary [180] case. If they could not do so prior to the time that case was to be

tried in November, 1933, their observations would be useless. They say the night they chose was the last and only night prior to the time the case was to be tried that the position of the moon and the light would be the same as it was the night Polk was arrested. Consequently, if the railroad gave the plaintiff permission to make the experiments on the chosen night and then, without warning or excuse, denied that permission at 2 o'clock in the morning the jury would have a right to draw an unfavorable inference against the railroad from that conduct. 31 C. J. S., sec. 157; Bryant v. Stilwell, 24 Pa. St. 314. As was indicated in the prior opinion, such evidence would be admissible on the issue of malice. 346 Mo. 1. c. 797. [For the elements and essentials of malicious prosecution see 3 Restatement, Torts, secs. 653-669; Higgins v. Knickmeyer-Fleer Realty Co., 335 Mo. 1010, 74 S. W. (2d) 805; Randol v. Kline's Inc., 322 Mo. 746, 18 S. W. (2d) 500; Carp v. Queen Ins. Co., 203 Mo. 295, 101 S. W. 78.] Polk's defense to the burglary charge was that he was not guilty, that he did not enter the merchandise car and that the Baxleys' testimony that they saw him enter and leave the car was false because it was impossible for them to have seen what they claimed they did and if his version of the matter is true such evidence would be admissible on the issue of probable cause for the arrest and charge in the beginning. Carp v. Queen Ins. Co., 203 Mo. 1. c. 338-339, 101 S. W. 78. On this appeal the plaintiff's evidence with respect to his private arrangements with the railroad to enter its premises and make observations and experiments is not subject to the objections pointed out on the second appeal and the objections having been obviated it was not error to permit such testimony.

The appellant does not complain of the award of $9,000.00 actual damages but it does contend that the allowance of $18,000.00 as punitive damages is excessive. The appellant does not indicate what the award should be but says that the facts do not justify an award of punitive damages in more than a very moderate amount. It says that despite the jury's finding there are mitigating circumstances. The railroad's merchandise cars destined for the Cherokee local had been burglarized four times, it was pure chance that the respondent happened to be in the yards that night and there was no preconceived plan to arrest him and there was no personal animosity.

Polk was forty-eight years of age when this case was tried in 1941. When he was arrested in 1933 he had worked for the railroad for eighteen years. He was in jail two weeks and the jail was extremely filthy. He was bound over to the district court and the fact of his arrest and the charges were published in the Parsons daily paper on at least two occasions. Polk, his wife and their two children say they were shunned by their former friends and acquaintances. The jury has found that the railroad acted with malice and that justifies an

award of punitive damages. Randol v. Kline's, Inc., 330 Mo. 343, 49 S. W. (2d) 112.

As punitive damages may be assessed so they may be revised if excessive (State ex rel. A., T. & S. F. Ry. Co. v. Ellison, 268 Mo. 225, 186 S. W. 1075), even though there is no hard and fast rule by which to measure such damages and even though each case presents a separate problem depending on its facts. Sperry v. Hurd, 267 Mo. 628, 185 S. W. 170. The chief purpose of punitive damages, as its name suggests, is to inflict punishment. The theory being that the punishment assessed is an example and a deterrent to similar conduct. Sperry v. Hurd, supra; Randol v. Kline's, Inc., supra. For that reason the jury is permitted a rather wide discretion in assessing punitive damages. Carp. v. Queen Ins. Co.; supra.

In Irons v. American Ry. Ex. Co., 318 Mo. 318, 300 S. W. 283, an award of $7,000.00 actual damages and $13,000.00 punitive damages was upheld. There the young man charged with burglary was in jail seven days. In Randol v. Kline's, Inc., 330 Mo. 343, 49 S. W. (2d) 112, there was an award of $12,000.00 actual damages and $25,000.00 punitive damages. A remittitur of $20,000.00 was required from the punitive damages. But in that case the young woman was not confined in a jail. In this case Polk was in jail two weeks. It is fair to note in this connection, however, that in 1934 he plead guilty to the misdemeanor of possessing liquor and served a jail sentence of twenty-two days in the county jail at Oswego. The first jury made him an award of $20,000.00 actual damages $2,500.00 punitive damages; the second jury allowed him $7,500.00 actual damages and $7,500.00 punitive damages. Considering all the elements permitted in allowing punitive damages and separating them from the items allowable as actual or compensatory damages [Randol v. Kline's, Inc., supra] it is our view, under the circumstances of this case, that the verdict for $18,000.00 punitive damages is excessive in the sum of $9,000.00.

It is, therefore, ordered that if the respondent will within ten days enter a remittitur of $9,000.00 from the award of punitive damages as of the date of the judgment, the judgment will be affirmed in the sum of $9,000.00 actual damages and $9,000.00 punitive damages; otherwise, the judgment will be reversed and the cause remanded. *Westhues, C.,* concurs; *Bohling, C.,* concurs in result.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.