**William J. BEGGS, Respondent,**

v.

**UNIVERSAL C. I. T. CREDIT CORPORATION, a corporation, Appellant.**

No. 51807.

Supreme Court of Missouri,
Division No. 1.

Dec. 30, 1966.

**720**

Donald L. Mason, Mason, Gant & Moran, Kansas City, for respondent.

Preston H. Longino, John W. Schwartz, Kansas City, for appellant.

HOUSER, Commissioner.

Action by owner of a motor transport tractor against a finance company for unlawfully taking possession of and damaging the vehicle. Judgment was entered on a jury verdict for plaintiff for $1,800 actual and $14,000 punitive damages. This was the second trial of the case. The first resulted in a judgment for plaintiff for $2,500 actual and $13,000 punitive damages. That judgment was reversed for wilful and intentional concealment by several jurors of information which should have been disclosed on voir dire examination. Beggs v. Universal C.I.T. Credit Corporation, Mo.Sup., 387 S.W.2d 499. Defendant has appealed from the judgment for $15,800.

Plaintiff owned two Diamond T tractors. Defendant had a mortgage on one of them.

Plaintiff was behind in his payments. Defendant demanded payment and plaintiff failed to pay on demand. Defendant's agent Price took possession of the tractor on which defendant did not have a mortgage. When recovered it needed extensive repairs. It was out of service for several weeks during the period of detention and repair.

On this appeal defendant contends that the award of actual damages is not supported by evidence and is excessive; that the issue of punitive damages should never have been submitted to the jury because the evidence is insufficient to establish wilful, wanton or malicious conduct (that Price merely made a mistake); that if the issue of punitive damages was submissible the award is so enormous that it should be substantially reduced, and that the court erred in excluding defendant's Exhibit No. 5.

*Actual damages:* We find substantial evidence to support the verdict of $1,800 actual damages. There was believable testimony that defendant's agent called a towing service which towed the tractor through the streets without "pulling the axles" or lifting the rear wheels off the street, thereby extensively damaging the transmission and power train; that the cost of repairing the damages was $909 and that plaintiff lost the use of the vehicle for three weeks at a loss of $300 a week, or $900.

*Punitive damages:* We find substantial evidence justifying the submission of the question of punitive damages.

There was testimony from which the jury could have believed the following facts: Plaintiff owned two Diamond T tractors. One was mortgaged to the defendant and the other was mortgaged to a bank. The one mortgaged to defendant was a 1959 model, diesel-powered, with a 194-inch wheelbase, two sets of drive wheels, a sleeper cab and a vertical exhaust pipe located at the back of the cab. The

tractor on which defendant did not have a mortgage was a 1958 model, gasoline-powered, with a 142-inch wheelbase, a single set of drive wheels, no sleeper cab and a horizontal exhaust pipe located underneath the tractor. Although both vehicles were red in color, trimmed in white, there were distinctive differences in appearance between the two.

The original loan on the 1959 tractor was for $19,837. When Price demanded payment there was a balance due of approximately $7,000, and three monthly payments of $551.03 were in arrears.

Defendant's collection manager Price was assigned to find Beggs, find the unit for which the defendant had been looking, a 1959 Diamond T diesel tractor, and bring the account current or make other arrangements, namely, "store" the tractor until the account should be brought to date. As an adjuster it was Price's duty "to get the money or get the truck." Considerable pressure had been brought to bear on Price by defendant to find Beggs and collect the past due money. When asked if there was "a lot of pressure" on him "to do this" Price answered "Just my job."

One evening Price found Beggs on the lot of the Blue Valley Transfer Company, where Beggs parked his tractors. There is nothing to indicate that the 1959 diesel tractor was parked there that day. The 1958 tractor had just completed a run and the driver had put the vehicle in gear and locked the cab. Price told Beggs that he was behind three payments and that he had to have the money "now." Beggs said that he did not have the money but that he could get it the next morning. Price told Beggs either to pay him "now" or he would "take this truck, and you can bring the money over in the morning and get your truck back"; that "we would have to store the truck until the account was brought current to date." Price was referring to the 1958 tractor then parked on the lot. Beggs said, "No, you can't

take the truck, because you haven't got a lien on it." Price answered, "Well, pay me the money and I won't." Beggs told Price that the bank had a lien on the truck and that he would pay the payments due "but [Price] wouldn't take no for an answer." The vehicle with which Price was concerned was "that truck right there." When Price was asked "You were not concerned whether that was the right truck or wrong truck, you were concerned with taking that truck or getting your money, weren't you?" Price answered "That is what I was sent out there for." The conversation went on for 30 or 45 minutes. Price followed Beggs into the office, from which Price made a telephone call to defendant's credit manager, to whom he said, among other things, that he had "finally trapped Beggs down here" at Blue Valley; that Beggs was there and had promised to pay him some money the next day, and that "the truck" was at the Blue Valley Transfer Company lot. The credit manager suggested that Price call the owner of the lot and get permission to drive the truck off the lot, and to have the truck towed away. The credit manager could not recall whether he asked Price if the truck on the lot was a 1959 Diamond T diesel, or if he had checked the serial number on the tractor he was about to take, stating that he relied on Price's training and judgment. After finishing the telephone conversation Price turned to Beggs and said "This is your last chance. I am going to take this truck unless you pay me the money"; that the truck would be released as soon as the account was brought to date. Beggs again told him that he could not take the truck because he had no lien on it. Price then called a towing service and arranged for the towing away of the tractor on the lot—the 1958 tractor which was not listed on defendant's mortgage.

At that time Price knew that the only truck owned by Beggs on which defendant had a mortgage was a 1959 Diamond T diesel. Price had in his possession the information as to the serial number of the

1959 Diamond T diesel, but he did not check the serial number on the tractor which he ordered towed away. Price did not ask Beggs if the tractor on the lot was a 1959 Diamond T diesel and Beggs did not volunteer the information that it was a 1958 Diamond T gasoline powered vehicle. When asked if he had asked Beggs for the serial number of the tractor on the lot Price answered that it was not Beggs' responsibility to tell him. Price claimed to be "under the impression" from an interoffice memo that this was the right truck. He had no previous experience with Diamond T trucks and did not know the difference between 1958 and 1959 models. At the trial Price testified that he did not know the difference between a diesel and a gasoline-powered truck, but acknowledged that in his deposition he had testified that he did know the difference. When the tractor came in that evening Price acknowledged that he did not know "for sure" what model it was. He did not know that the tractor he caused to be towed away was a 1958 model until the next morning when he went to his office. When he found out he did not make any effort to call Beggs and tell him he was sorry and that he had made a mistake. He said it was then out of his hands; that he had "done his job", that he did not know what Beggs' telephone number was and that he really "could have cared less."

The test to be applied in determining whether malice existed as a basis for the award of punitive damages is whether the defendant did a wrongful act intentionally and without just cause or excuse. "This means that defendant not only intended to do the act which is ascertained to be wrongful but that he knew it was wrongful when he did it. There must be, in order to justify punitive damages, some element of wantonness or bad motive, but if one intentionally does a wrongful act and knows at the time that it is wrongful he does it wantonly and with a bad motive." Luhmann v. Schaefer,

Mo.App., 142 S.W.2d 1088, 1090 [7]; Hussey v. Ellerman, Mo.App., 215 S.W.2d 38, 41; Davis v. Nash Central Motors, Mo.App., 332 S.W.2d 475, 480. Furthermore, an evil intent may be implied from reckless disregard of another's rights and interests. Pashalian v. Big-4 Chevrolet Co., Mo.App., 348 S.W.2d 628, 637.

■ The jury could properly believe that in taking possession of the 1958 tractor under the circumstances of this case defendant was doing a wrongful act intentionally and without just cause or excuse. The only pretense under which defendant could have claimed the right to take possession of plaintiff's 1958 Diamond T tractor was under and by virtue of a mortgage on that particular tractor. Its authorized agent, however, was plainly and repeatedly informed of a fact which if true completely destroyed its claim. Twice Price was told that his company had no lien on the vehicle which he proposed to take. He was further informed that "the bank" had a mortgage on it. In spite of this notice, Price made no effort to identify the tractor on the lot as the tractor covered by defendant's mortgage, notwithstanding he had been trained to make such a check before repossessing property. With actual notice that the vehicle in question was not the vehicle for which he was looking, and without taking the elementary precaution of checking the serial number of the intended vehicle against the serial number stated in the records in his possession, defendant's agent forcibly took possession of the wrong vehicle over the repeated protests of the rightful owner. Price's conduct, for which defendant is responsible, demonstrated a callous disregard for and a studied indifference to the known rights and interests of the plaintiff.

*Exhibit No. 5:* There was no error in excluding defendant's Exhibit No. 5. This was an interoffice communication in Price's handwriting, signed by him, reporting the interview with Beggs, that the truck was "now setting on our lot" and asking for instructions about selling it. Attached to the memo was a "repossessed car appraisal" printed form, with the blank spaces filled in, signed by Price, reporting that the repossessed vehicle was the 1959 Diamond T truck and stating the correct serial number of the 1959 vehicle. These papers were dated April 17, 1961. They purported to report on events which happened on April 15, 1961. They were offered under the Uniform Business Records as Evidence Act, § 490.680, V.A.M.S., on the issue of the "mental state of mind of defendant as to whether or not the defendant knowingly committed a wrongful act at the time of the repossession of the 1958 truck" on the theory that it is evidence that Price was reporting that repossession in the usual manner and that he was reporting the repossession of a 1959 truck with a 1959 serial number and other identification, showing that he considered that he had repossessed the right truck.

■ The exhibit was objected to on the ground that it was a self-serving statement. Price, who prepared and signed it, attended the trial, was available as a witness and testified. By his own testimony it was established that Price discovered that the tractor taken was a 1958 model *the next morning* when he went to the office; less than 24 hours after the taking. Thereafter Price prepared Exhibit No. 5, reporting the taking of the 1959 model. By his own testimony Price must have knowingly made a false report. The court, which has a wide discretion in determining whether proper facts have been established to justify the admission of a record under the uniform act, Fisher v. Gunn, Mo.Sup., 270 S.W.2d 869, did not err in excluding this exhibit, which was clearly self-serving, see Terrell v. Missouri-Kansas-Texas R. Co., Mo.Sup., 327 S.W.2d 230, 240, and which was branded false by its own author.

*Excessiveness:* On the question of the size of the award for punitive damages defendant claims that $14,000 is so enormous under the circumstances that the jury must

have misjudged the penalty necessary as a deterrent to future actions of this kind, and is so excessive that it shows bias and prejudice on the part of the jury.

Punitive damages are awarded for the purpose of inflicting punishment for wrongdoing, and as an example and deterrent to similar conduct. Polk v. Missouri-Kansas-Texas R. Co., 351 Mo. 865, 174 S.W.2d 176; Peak v. W. T. Grant Co., Mo.App., 386 S.W.2d 685; Wehrman v. Liberty Petroleum Co., Mo.App., 382 S.W.2d 56; State ex rel. Boswell v. Curtis, Mo.App., 334 S.W.2d 757. The amount to be awarded lies wholly within the sound discretion of the jury and a court will not interfere with the jury's assessment of punitive damages unless there is an abuse of discretion. Mitchell v. Pla-Mor Inc., 361 Mo. 946, 237 S.W.2d 189; Peak v. W. T. Grant Co., supra; or the size of the award is indicative of passion, prejudice or bias. Hunter v. Kansas City Rys. Co., 213 Mo. App. 233, 248 S.W. 998. Ordinarily abuse of discretion in this reference means so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of the honest exercise of judgment. Peak v. W. T. Grant Co., supra. There is no fixed relation between the amount of actual damages and the amount of punitive damages that may be awarded, State ex rel. St. Joseph Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351; Wehrman v. Liberty Petroleum Co., supra, and no fixed standard by which they can be measured, Sperry v. Hurd, 267 Mo. 628, 185 S.W. 170, but generally, punitive damages must bear some relation to the injury inflicted and the cause thereof. The jury should take into consideration the attendant circumstances, State ex rel. St. Joseph Belt Ry. Co. v. Shain, supra, including the mitigating and aggravating circumstances. Summers v. Keller, 152 Mo. App. 626, 133 S.W. 1180. The defendant's worth or financial condition (shown here

to be $49,000,000) is a consideration. Brown v. Payne, Mo.Sup., 264 S.W.2d 341; Dawes v. Starrett, 336 Mo. 897, 82 S.W.2d 43; Thomas v. Durham Motors, Inc., Mo.App., 389 S.W.2d 412. And see 25 C.J.S. Damages § 126(1).

In support of its position defendant cites two cases: Randol v. Kline's, Inc., 330 Mo. 343, 49 S.W.2d 112, and Newport v. Montgomery Ward & Co., 344 Mo. 646, 127 S.W.2d 687. In Randol, decided in 1932, an award of $25,000 punitive damages in a malicious prosecution action was ordered cut to $5,000. In Newport, decided in 1939, a remittitur of $10,000 was ordered where the jury had awarded $12,000 punitive damages in a false imprisonment case.

In Irons v. American Ry. Express Co., 318 Mo. 318, 300 S.W. 283, a malicious prosecution case, a verdict of $13,000 punitive damages was upheld. In Polk v. Missouri-Kansas-Texas R. Co., (1943), supra, another malicious prosecution case, an award of $18,000 punitive damages was considered excessive by $9,000. In Wehrman v. Liberty Petroleum Co., (1964), supra, a punitive damage verdict for $7,500 in a false arrest case was approved. In 1937 a verdict of $1 actual and $10,000 punitive damages was returned in an action for failure to give a proper service letter upon discharging a railroad employee. The trial court ordered a remittitur of $6,000. On certiorari this Court upheld the action of the Kansas City Court of Appeals affirming the circuit court judgment, in effect approving an award of $4,000 punitive damages in a case where the actual damages were $1. State ex rel. St. Joseph Belt Ry. Co. v. Shain, supra.

Turning to cases of wrongful seizure of a motor vehicle by a finance company, in 1936 the Supreme Court of Pennsylvania declared that an award of $1,260 as punitive damages was not excessive, in Stone v. C.I.T. Corp., 122 Pa.Super. 71, 184 A. 674. Two years later the same court held that

$2,500 for the wrongful taking of an automobile worth $800 was excessive and required a reduction of $1,500. Voltz v. General Motors Acceptance Corp., 332 Pa. 141, 2 A.2d 697. In Thomas v. Commercial Credit Corp., Mo.App., (1960), 335 S.W.2d 703, a trial jury awarded $2,000 punitive damages for wrongfully taking an automobile valued at $400, but the award was set aside because the evidence did not warrant any award of punitive damages.

■ There is nothing to indicate that the managing officials of the defendant were guilty of wrongdoing, such as conspiring to tie up Beggs' operations, or instructing their agent Price to take any of Beggs' property he might find. Price was instructed to take the 1959 tractor *on which the company had a lien,* if he could not get the money. If the managing officials themselves were at fault it was in putting too much pressure on Price to get results. Under all of the facts and circumstances of this case, in the light of the general principles of law and the decided cases, we have concluded that the award of $14,000 punitive damages is excessive by $6,500.

It is therefore ordered that if plaintiff will within fifteen days enter in this Court a remittitur of $6,500 from the award of punitive damages as of the date of the judgment, the judgment will be affirmed in the sum of $1,800 actual and $7,500 punitive damages; otherwise, the judgment will be reversed and the cause remanded.

WELBORN and HIGGINS, CC., would affirm without remittitur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.